[Crim. No. 19699. Mar. 23, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
SALVADOR RAY ENRIQUEZ, Defendant and Appellant.

**COUNSEL**

Jeffrey C. McIntyre, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., Russell Iungerich and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, J.**\*—Salvador Ray Enriquez appeals from a judgment after convictions by jury of assault with a deadly weapon (Pen. Code, § 245, subd. (a)) and voluntary manslaughter (Pen. Code, § 192, subd. 1).[1]

Defendant contends as to the assault conviction that the trial court erred in receiving evidence of a prior conviction of a witness of assaulting the same victim in the same encounter, and in its failure to give particular instructions on self-defense. He also contends that the indeterminate sentence provided for a violation of section 245, subdivision (a), is unconstitutional. We reject all of such contentions. We agree, however, with defendant's contention as to the manslaughter conviction that because the People failed to demonstrate that they had exercised due diligence in locating a witness the court erred in receiving the prior recorded testimony of such witness. We deem the error to be prejudicial and reverse the judgment as to the manslaughter conviction. We also express our views as to the admissibility of certain of defendant's extrajudicial statements, as such issues may again be presented should defendant be retried for the homicide.

### CONVICTION OF ASSAULT WITH A DEADLY WEAPON

While attending a public carnival, David Corona, his brother and a friend were approached by a group of about 12 young men, including defendant and Steven Lagunas. Steven instigated a fist fight with David and both Steven's and David's companions joined in the affray. Defendant was armed with a linoleum knife with which he attacked David, cutting him seven times. Defendant left the scene with his

---

\*Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

[1]Unless otherwise specified all statutory references are to sections of the Penal Code.

Defendant was initially separately charged by information in case No. A435544 with aggravated assault (§ 217) while armed with a deadly weapon (§ 12022), in case No. A436319 with murder (§ 187) while armed with a deadly weapon (§ 12022), and in case No. A436323 with robbery (§ 211) during the commission of which he had used a firearm (§ 12022.5). Each case arose out of a separate course of conduct. The information in A435544 was amended to charge a violation of section 245, subdivision (a), in place of a violation of section 217. All the informations were amended by striking the "armed" or "use" allegations. The cases were then consolidated for trial under case No. A435544 with the assault, murder and robbery violations alleged as counts I, II and III respectively. Defendant was convicted of assault with a deadly weapon, as charged in count I, and of voluntary manslaughter, a lesser included offense under the charge of murder as alleged in count II. He was acquitted of the robbery as charged in count III.

companions when someone announced that police were arriving. David and his brother both identified defendant from photographs exhibited to them by police. David also identified defendant at the preliminary hearing and at trial. A bloodstained linoleum knife was found near the scene of the fight and was identified by David and his brother as the weapon used by defendant during the fight.

At trial Steven Lagunas was called as a witness for the People. When interviewed by a police officer he had stated that defendant had been carrying a linoleum cutting knife in his belt. Steven testified at trial, however, that he had told the officer only that defendant "might have" had a linoleum cutting knife in his belt and that he "might have told" the officer that defendant stabbed David. He further testified that defendant had not fought with a knife but had used only his hands and fists. On redirect examination, in response to the prosecutor's question, Steven conceded that he had been convicted of assaulting David and was then on probation. No objection was raised by defendant.

Defendant testified in his own behalf that on the evening of the fight he was drunk; that he saw David and Steven swinging at each other; that while witnessing the affray he was kicked in the head by David's brother; that he saw David in front of him and began swinging at David with his fists; and that he did not have or use a knife at any time. Other defense witnesses testified that although they were present at the fight they saw no knife in defendant's hands.

Defendant now contends that the prior conviction to which Steven admitted was a misdemeanor (§§ 240, 241) and therefore was not a matter upon which a witness could be impeached. (See Evid. Code, §§ 787, 788.) As no objection was raised at trial, however, defendant cannot now raise the issue on appeal. (*People* v. *Nugent* (1971) 18 Cal.App.3d 911, 917 [96 Cal.Rptr. 209].) Nor can defendant rely on a later objection during the trial by defense counsel which was directed to the prosecutor's attempt to discredit Steven's testimony with his prior inconsistent statement as such objection did not serve to challenge the disclosure of the prior conviction. (See *People* v. *Lint* (1960) 182 Cal.App.2d 402, 414-415 [6 Cal.Rptr. 95].) Contrary to defendant's further contention, the trial court had no duty to instruct the jury on the issue *sua sponte* and the decisions cited in support of such contention are inapposite.

■ Defendant also complains that the trial court's instructions on self-defense were inadequate as they did not fairly advise that such defense was applicable to the assault count as well as to the homicide count. Although he did not request such instructions, defendant now claims that the court should have instructed in terms of CALJIC Nos. 5.30 and 5.31.

The court instructed the jurors on the general principles of self-defense. (CALJIC Nos. 5.51-5.53.) A trial court is not, absent a request therefor, required to instruct on specific points developed out of the particular facts presented at trial. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370]; *People* v. *Cisneros* (1973) 34 Cal.App.3d 399, 418-419 [110 Cal.Rptr. 269].) The question presented is whether under the circumstances of this case the instructions which defendant now urges should have been given related to a specific concept of self-defense which the court could not readily conceive as being relied upon by defendant. (*People* v. *Wade* (1959) 53 Cal.2d 322, 335 [1 Cal.Rptr. 683, 348 P.2d 116]: "Omniscience is not required of our trial courts.")

The evidence most favorable to defendant indicated that he had been drawn into the fight when the victim kicked defendant and struck him on the jaw. There was no evidence suggesting that either the victim or his companions were armed. CALJIC No. 5.30 instructs that a person being subjected to an assault may use all force he believes reasonably necessary to prevent an injury which appears imminent. CALJIC No. 5.31, however, places a limitation on the amount of retaliatory force which may be used against an assault with fists. Such an assault does not justify the use of a deadly weapon in self-defense. The court, which had generally instructed in terms which would permit the use of reasonable force, including deadly force if necessary, could not be aware that defendant, in the face of persuasive evidence that he had used deadly force, nevertheless desired further instructions which would advise the jury that although he could defend against a simple attack by fists he could not use deadly force. Such instructions might well be deemed to prejudice the defense generally. If defendant nevertheless desired instructions on the specific point, it was incumbent upon him to request them. He cannot wait until the jury has rejected his general claim of self-defense and then be heard to complain about the failure to instruct

on a specific posture of the defense which might have detracted from the defense generally.[2]

Defendant finally contends as to the assault conviction that the procedures set out in *People* v. *Wingo* (1975) 14 Cal.3d 169 [121 Cal.Rptr. 97, 534 P.2d 1001] and *People* v. *Romo* (1975) 14 Cal.3d 189 [121 Cal.Rptr. 111, 534 P.2d 1015] for attacking an indeterminate sentence for a violation of section 245, subdivision (a) are unconstitutional. He urges numerous infringements of constitutional proportions.

Defendant first claims that he is denied the effective assistance of counsel because if he is compelled to attack his indeterminate sentence as fixed by the Adult Authority he will be compelled to seek without the initial aid of counsel, a writ of habeas corpus in a proceeding in which he has the right to counsel. Such argument assumes, however, a particular infringement of a constitutional right prior to the time that such has occurred. If any of defendant's constitutional rights have thus far been infringed, including his right to be sentenced under a law which is not constitutionally defective, such issues can be raised on this appeal at which he is entitled to and is in fact represented by counsel. (See *People* v. *Wingo, supra,* 14 Cal.3d 169, 183, fn. 14.)

Defendant next claims he is denied equal protection of the law because other felons not subjected to an indefinite term of imprisonment may attack the length of their terms on direct appeal. The equal protection clause does not assure defendant of the same treatment as all other felons; it assures him only, in this respect, that he will receive like treatment with all other persons similarly situated. (*Truax* v. *Corrigan* (1921) 257 U.S. 312, 333 [66 L.Ed. 254, 263, 42 S.Ct. 124, 27 A.L.R. 375]; cf. *Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 60 S.Ct. 879, 130 A.L.R. 1321]; *People* v. *Romo, supra,* 14 Cal.3d 189, 196.) Defendant is in a special class of felons whose crimes warrant a possible life sentence and he is entitled to be treated the same as all others in that class. (See *People* v. *Wingo, supra,* 14 Cal.3d 169, 183.) He does not claim that he is not receiving the same treatment as others in that class, or that the legislative classification for his crime is defective. (See *People* v. *Romo, supra,* 14 Cal.3d 189, 196-197.)

---

[2]Defendant also presents the foregoing contention in an alternative argument. He states that the instructions as given were unclear as the jurors might have believed that the doctrine of self-defense applied only to homicides. Our examination of the instructions as a whole, however, refutes defendant's contention.

■ Defendant further claims that it is fundamentally unfair to require a convict untrained in the law to challenge the sentence for his crime by habeas corpus proceedings, and to require that he repeat his challenge each time the sentence is redetermined. Due process, however, does not purport to relieve a person seeking to invoke a fundamental right of the burden of asserting such right in terms permitting a prima facie evaluation thereof. In *Wingo* we approved the procedure of which defendant now complains: "Habeas corpus is the remedy available to an aggrieved petitioner *after his term has been set. . . .* Any petitioner challenging his term as disproportionate *will bear the burden* of demonstrating that his sentence is excessive, which challenge, if devoid of merit, may be disposed of by summary denial." (*People* v. *Wingo, supra,* 14 Cal.3d 169, 183, italics added.) Although our statements in *Wingo* were not directed to a challenge on due process grounds, we now hold that the minimal requirements imposed on such a petitioner do not constitute a denial of due process. Moreover, defendant will not be put to the burden of mounting new challenges to his sentence on each occasion of a redetermination thereof as a primary term once fixed cannot be exceeded although it may be reduced. (*In re Rodriguez* (1975) 14 Cal.3d 639, 651-653 [122 Cal.Rptr. 552, 537 P.2d 384].) Our holdings in *Rodriguez* that the primary term remains the maximum term which a convict may be required to serve, and in *Wingo* that the term must be proportionate to the crime and must be set within a reasonable time (*People* v. *Wingo, supra,* 14 Cal.3d 169, 184), also refute defendant's contention that the term-fixing process is so uncertain that it denies due process of law.

Defendant's further contention that his attack on the statutory sentence under section 245, subdivision (a), is not premature, is directly contrary to the express holding in *Wingo*. (*Id.,* at p. 184.) His final constitutional attack that the judiciary has delegated its responsibility to fix a maximum term neglects the fact that the judiciary is not vested with that responsibility. (*In re Minnis* (1972) 7 Cal.3d 639, 643, 644 [102 Cal.Rptr. 749, 498 P.2d 997].)

### CONVICTION OF VOLUNTARY MANSLAUGHTER

During evening hours in August 1974 defendant, Paul Prieto, Mr. Prieto's mother and two other persons were outside an apartment building. According to the testimony of Paul Prieto at the preliminary hearing Alton Butler, the victim of the homicide, came out of the building and approached the group. He was armed with a knife and

swung the knife several times at one or the other of the persons present. He swung the knife at defendant, wounding him on the side of the body. Butler then directed his attention to Prieto, who was wounded on the hand when he sought to defend himself and his mother against the attack. Butler next returned to defendant who was then standing adjacent to his car parked at the curb. Prieto did not know how or precisely when the knife changed hands, but at some point in the altercation the knife apparently fell from Butler's hand and was retrieved by defendant. Prieto saw defendant stab Butler with the knife several times in the stomach area, and Butler fell to the ground. Defendant turned Butler's body over, and left in the car. Two of Butler's stab wounds were fatal.

Defendant was arrested approximately four hours after the homicide. He had a cut on his forearm which was oozing blood. He said that he had sustained the wound while at work the previous day. There was blood spattered on his car which he did not attempt to explain.

At trial the prosecutor successfully moved, over the objection of counsel for defendant, that the testimony of Paul Prieto as recorded at the preliminary hearing be read into evidence. The motion was made and granted on the ground that Prieto was wilfully absent and that the prosecutor had exercised due diligence in attempting to locate and produce him in court.

The court also received in evidence over defense objections extrajudicial statements in which defendant asserted six days after his arrest a false alibi during police interrogations and again claimed that he had cut his forearm at work the day before the homicide. Defendant's objection was on the ground that the police had not honored his stated wish not to be interrogated without the presence of an attorney. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; see *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625].) At a hearing on the issue whether the police had unlawfully persisted in questioning defendant contrary to his wishes, a transcript of a portion of a tape recording of the interrogation was read into the record and is set out in the margin.[3]

---

[3]After defendant was advised of his *Miranda* rights and stated that he understood them, the following transpired:
"Q [First Interrogator]: Do you want to talk about this case or not?
"A [Defendant] Talk about it what?
"Q Do you want to talk about this case or do you not?
"A Yeah, I'll talk about it.

Paul Prieto's mother testified for the defense regarding the events leading up to the homicide. Her testimony was essentially the same as her son's testimony at the preliminary hearing except that she stated that

"Q Do you want a lawyer or not?
"A Here right now you mean?
"Q That's correct.
"A Yeah, I want a lawyer.
"Q Okay.
"Q [Second Interrogator]: You want a lawyer prior to carrying on any conversation in regards to this murder investigation we have just described to you?
"A Yeah.
"Q You don't want to have any conversation with us at all at this time?
"A I want, I want to find out you know, what is going on.
"Q Well, what's going on is that we are conducting a Murder Investigation uh in which Mr. Butler was killed and if you chose [sic] not to discuss anything with us without at [sic] attorney, obviously we do not have an attorney present in this room at this moment. So, consequently, we do not continue on with the conversation. You do understand your Constitutional Rights?
"A Yeah.
"Q Have you been arrested before?
"A Yes.
"Q Have you had your Constitutional Rights read to you before?
"A Yes.
"Q Did you understand the Constitutional Rights then?
"A Yeah.
"Q And you understand, understand the Constitutional Rights, now?
"A Yes.
"Q Okay, and at the present time you chose [sic] not to talk to us about this case, is that correct?
"A Well I mean, I want to talk about it, I mean I want to know what, you know, what this is man.
"Q Well we cannot carry a conversation on with you if you are going to demand uh demand the lawyer. Cause obviously we do not have a lawyer present here. We have three investigators and yourself. If you want to waive your right to an attorney and talk to us about the case, we will talk to you about the case.
"A And I don't know, and I don't know, I want to figure out what's going on.
"Q You give up your Constitutional Rights to having an Attorney present at this time?
"A Yeah.
"Q You do so freely and voluntarily of your own volition?
"A Yeah.
"Q Do you understand what I mean by freely and voluntarily?
"A Yeah.
"Q All right, do you understand each of the rights that have been explained to you?
"A Yes.
"Q Do you want to talk about this case or not?
"A Yes I do.
"Q Do you want a lawyer now or not?
"A No.
"Q No, you do not want a lawyer present?
"A No.
"Q At this time. Have you read this Admonition card, can you read it out loud to me?
"A You have the right to remain silent.
"Q I can't hear you, you have to speak up.

she never saw a knife in defendant's hands, nor did she see how the victim was stabbed. She did observe defendant hitting at the victim in the area of the abdomen. Prior to trial she had told police investigators that she was positive defendant had stabbed the victim. Another defense witness present at the time of the homicide testified in a manner suggesting that defendant had acted in self-defense.

Defendant testified in his own behalf. He claimed that he was under the influence of drugs and alcohol at the time of the homicide; that he saw the victim swing the knife at several persons; that he was frightened by the man's conduct and told him to put the knife down; that the victim succeeded in cutting defendant on the side of the body and on the forearm and threatened to kill defendant; that defendant could not remember what occurred afterwards. Defendant admitted that he had made false statements to police to the effect that he had cut his forearm at work and had been elsewhere during the time of the homicide.

 It fairly appears from the foregoing that the victim of the homicide had assaulted a number of persons, including defendant, and that defendant had responded to the assault with force which raised a question whether the degree thereof was reasonably necessary or, at the time asserted by defendant, any force at all was reasonably necessary. The jurors were apparently of the view that defendant's conduct was not

---

"A You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to, to talk to a lawyer before we talk to you and to have him present while we talk to you. If you cannot afford one, afford to hire a lawyer, one will be appointed to pre- what?
"Q Represent. .
"A . . represent you before any questioning, free of charge.
"Q Do you know what represent means?
"A Yeah.
"Q What does represent mean?
"A Well, if I can't pay for a lawyer uh the courts will appoint one to me.
"Q Okay, do you understand those rights?
"A Yeah.
"Q Do you now want to discuss the case with us?
"A Yeah.
"Q And this is you talking to each of the three investigators in this room without having an attorney present?
"A Yeah.
"Q All right, are you of age?
"A I'm 21..
"Q 21 years of age. All right, you've read all of the Constitutional Rights that you have there?
"A Yeah.
"Q And you do not want a lawyer?
"A No."

justified on the claim that he had acted in self-defense. As the only direct evidence that defendant used deadly force against the victim was contained in the testimony of Paul Prieto, such testimony must be deemed a substantial factor in the jury's determinations. As noted, the testimony was received as prior recorded testimony over defendant's objection that the People had not exercised due diligence in attempting to produce Prieto at trial. The circumstances attending Prieto's nonappearance are hereinafter related.

When the case was first called for trial on November 6, 1974, Prieto was in court. The case was trailed to the following day and Prieto was ordered to return on that day. He failed to appear on November 7 and a bench warrant was ordered issued but held until November 27, to which day the case was continued. When Prieto did not appear on November 27 the hold on the bench warrant was released and the case was continued to January 10, 1975, on which date the selection of jurors began. When the People sought on January 14 to introduce Prieto's preliminary hearing testimony and defendant objected, the People offered *no* testimony on the issue of due diligence. The defense called Prieto's mother, who testified as to the availability of her son. She stated that since November Prieto had been living in Bakersfield picking crops and that he "comes over here to L.A." from Bakersfield. She did not have his address in Bakersfield but she thought she could locate him through his brother who lived in Riverside. When asked on cross-examination by the prosecutor, "Why didn't you ever tell me where he was located?" she replied, "You never asked me. I never talked to you. I told you he had gone to Bakersfield, but I didn't know where he was at that time . . . ." On redirect examination the witness testified that she had talked to no one in law enforcement concerning the whereabouts of her son since November 6th.[4] According to the trial court there was no return on the bench warrant.

---

[4]On recross-examination the following exchange ensued between the witness and the prosecutor:

"Q Well, I asked you—

"A Right now, yes.

"Q —in court on a previous occasion where Prieto was, didn't I, and—

"A Yes, and I told you he was in Bakersfield.

"Q . . . Didn't you tell me he was up north somewhere but you didn't know exactly where?

"A Yeah, I just told you that he was up in Bakersfield, but I didn't know the address.

"Q Before you didn't even mention Bakersfield, did you?

"A Yes, I did.

"Q What is he doing in Bakersfield?

"A I don't know. Picking—

The trial court, in ruling on defendant's objection, stated that it found that Prieto had wilfully absented himself and that his "mother . . . is wilfully attempting to aid [him] in this regard, and that under the circumstances the request of the [prosecutor] for a bench warrant and the attempt to question the mother as to his whereabouts would constitute due diligence . . . ." The court also noted that "this witness [Prieto's mother] is a hostile witness and isn't particularly interested in seeing this case prosecuted at all."

■ A criminal defendant has a right to confront witnesses against him (U. S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15; Pen. Code, § 686), but that right is not absolute. The United States Supreme Court in *Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318], recognizes that "there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." (*Id.,* at p. 722 [20 L.Ed.2d at p. 258].) The court concluded that a witness is not "unavailable" under the foregoing exception "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." (*Id.,* at pp. 724-725 [20 L.Ed.2d at p. 260]; see also *Pointer* v. *Texas* (1965) 380 U.S. 400, 405 [13 L.Ed.2d 923, 927, 85 S.Ct. 1065].)

The Evidence Code is in harmony with the foregoing principles. Prior testimony may be introduced if, among other things, the declarant is unavailable as a witness. (Evid. Code, § 1291.) Unavailability may be established by showing that the declarant is "[a]bsent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) The burden of proof of unavailability is on the proponent of the evidence (see *People* v. *Benjamin* (1970) 3 Cal.App.3d 687, 696 [83 Cal.Rptr. 764]; com. to Evid. Code, § 405), and the showing must be made by competent evidence (*People* v. *Green* (1963) 215 Cal.App.2d 169, 171 [30 Cal.Rptr. 83]). " 'Whether due diligence has been shown is a factual question to be determined according to the circumstances of each case. [Citation.] Unless there has been an abuse of discretion, the ruling of the trial judge will not be disturbed. [Citations]' " (*People* v. *Williams* (1973) 9 Cal.3d 24, 35 [106 Cal.Rptr. 622, 506 P.2d 998], quoting from *People* v. *Peters* (1969) 276 Cal.App.2d 71, 78 [80 Cal.Rptr. 648].)

"Q You told me he was picking fruit up north?
"A Well, Bakersfield is up north. That is what I said, it was up north."

It appears from the trial court's statements in concluding that the People had exercised due diligence that it was influenced, in part at least, by what it discerned as the failure of the witness' mother to cooperate with the prosecutor. But even if we assume that the court could properly have found that the mother was not cooperative, the measure of due diligence is not the difficulties imposed by a search for a witness, but rather the diligence exercised in surmounting those difficulties. Here the only actions undertaken by the prosecution, according to the trial court and on our evaluation of the record, was to request issuance of a bench warrant and, at some undisclosed time, to ask the absent witness' mother where he might be located. Insofar as the record discloses the prosecution never attempted to serve the warrant or to locate Prieto based on information provided by the mother or otherwise available to the prosecutor. The People know, for instance, that Prieto was 17 years of age and had indicated at the preliminary hearing that he expected to attend a particular local high school. No effort was made to locate him through the high school. Nor was any effort made to serve the warrant on Prieto at his mother's home where, in view of the fact that he was only 17 years of age, he might be expected to be found from time to time. It fairly appears that the prosecution also knew that Prieto might be picking fruit "up north" if not in Bakersfield, yet no effort was made to reach him through employer organizations or through farm labor unions or other employee organizations. Although the prosecutor indicated in his examination of Prieto's mother that she had provided him with only vague information, diligence on the prosecutor's part would have required at least an effort to obtain more precise information. According to the record, however, the prosecutor made *no* effort to speak with the mother after Prieto's November 6th disappearance. The record discloses no effort to ascertain the names of Prieto's friends or acquaintances who might have been able to provide information as to his whereabouts.

It is possible, of course, that none of the foregoing or other efforts to locate Prieto would have been productive, but the proponent of prior recorded testimony cannot rely upon the premise that all efforts, if undertaken, would be unsuccessful and hence no effort need be made. Here the prosecutor did just that. He explained his failure to take action on the ground that ". . . [t]rying to serve a warrant on an itinerant fruit picker is like looking for a needle in a haystack." (Compare *People* v. *Smith* (1970) 4 Cal.App.3d 403, 405-411, 412-415 [84 Cal.Rptr. 412].)

The record before us discloses that the prosecution exercised only casual indifference, not diligence, in attempting to serve the warrant on

Prieto. It is not enough to merely ask that the warrant issue and then surrender all effort to serve it because the only source of information is uncooperative. We are of the view that the trial court abused its discretion in concluding that the prosecution had exercised due diligence. As the evidence disclosed in the prior recorded testimony was critical to the prosecution's case for reasons stated above, the error was clearly prejudicial and the judgment must be reversed as to the manslaughter conviction. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Because we have concluded that the manslaughter conviction must be set aside for reasons stated above, it is not essential to our disposition herein that we determine whether defendant's extrajudicial statements were received in evidence contrary to *Miranda* prohibitions. It appears, however, that such issue may again be presented should defendant be retried for the homicide of Alton Butler, and we accordingly express our views thereon.

■ *Miranda* holds, unequivocally, that "[i]f [a suspect who has been advised of the prescribed constitutional rights] states that he wants an attorney, the interrogation must cease until an attorney is present." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723]; see also *People* v. *Randall* (1970) 1 Cal.3d 948, 954-958 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Ireland* (1969) 70 Cal.2d 522, 532-537 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 717-720 [68 Cal.Rptr. 817, 441 P.2d 625].) In *Ireland* we stated that even an indirect indication that a suspect wants an attorney present compels an immediate cessation of the interrogation until an attorney is present. (*People* v. *Ireland, supra,* 70 Cal.2d 522, 535-536; see also *People* v. *Burton* (1971) 6 Cal.3d 375, 384 [99 Cal.Rptr. 1, 491 P.2d 793].) Here, on two occasions, once in response to each interrogator (see fn. 3), defendant stated that he wanted an attorney present, yet the interrogators continued without interruption until defendant, hoping to be advised of the prosecution's case, surrendered his right to have an attorney present. (Cf. *People* v. *Steger* (1976) 16 Cal.3d 539, 550 [128 Cal.Rptr. 161, 546 P.2d 665]; *People* v. *Smith* (1969) 270 Cal.App.2d 715, 723 [76 Cal.Rptr. 53].)

The People, citing *People* v. *Fioritto, supra,* 68 Cal.2d 714, 719, seek to justify their conduct on the ground that *Miranda* does not prohibit the use of subsequent statements volunteered by a suspect, after having once successfully asserted his right to have an attorney present. But defen-

dant's statements in the instant case were not subsequently volunteered; they were, instead, the product of continued police pressure to waive the right to an attorney. We noted in *Fioritto* that the *Miranda* prohibition was against "continued questioning after an individual has *once* asserted his constitutional rights." (*Id.*) The People also contend that there is no prohibition against the police subsequently asking a suspect if he wishes to reconsider and submit to interrogation, citing *People* v. *Rice* (1971) 16 Cal.App.3d 337, 343 [94 Cal.Rptr. 4] and *People* v. *Duran* (1969) 269 Cal.App.2d 112, 116-117 [74 Cal.Rptr. 459]. The cases cited by the People are inapposite, as in such cases the suspect was not subjected to a continuing pressure to waive his rights.[5]

We conclude that just as *Miranda* prohibits continued police interrogation into the substantive crime after a clear indication that a suspect wants an attorney present, it also prohibits continued police efforts to extract from a suspect a waiver of his rights to have an attorney present after a clear indication that the suspect desires such an attorney.

We need not and do not consider the question of the prejudicial effect of the erroneous receipt of defendant's extrajudicial statements with respect to the homicide conviction, as the judgment must otherwise be reversed as to that conviction. ■ There remains a question, however, as to the prejudicial effect on the assault conviction of the receipt of such extrajudicial statements. Although the erroneously received extrajudicial statements did not relate in any way to the assault on David Corona, they were nevertheless established as false when defendant testified directly contrary thereto, and their receipt in evidence thus damaged defendant's credibility generally. He had testified in defense to the assault charge that although he had engaged in a fist fight with David Corona he had not used a knife against David. The jury obviously did not believe him and the question thus raised is whether such disbelief was grounded on the erroneous receipt of the false, exculpatory statements.

It fairly appears that the jury elected to disbelieve defendant's testimony for numerous reasons, only one of which was dependent upon the erroneous receipt of the false statements. Both David and his brother

[5]In *People* v. *Randall, supra,* 1 Cal.3d 948 we stated, in apparent conflict with the proposition for which the People cite *Rice* and *Duran*: "After the initial assertion of the privilege, the defendant is entitled to be free of police-initiated attempts to interrogate him. Any statements made by a defendant in response to such questioning cannot be characterized as voluntary." (*Id.,* at p. 958; see also *People* v. *Burton, supra,* 6 Cal.3d 375, 384.)

testified that defendant attacked David with a knife. A bloodstained knife of the type described by David and his brother was found at the site of the fight. David suffered numerous knife wounds, and there is no testimony which supports a theory that David had engaged any other adversary in a manner and for a time sufficient to have suffered his numerous wounds at the hands of such other adversary. Even defendant's confederate, Steven Lagunas, conceded that he might have told a police officer that defendant had entered the fight armed with a knife similar to the knife found at the site and had used a knife to stab David, although such witness refused to so testify at trial. Lagunas' prior inconsistent statement to the officer was received in evidence and its content constitutes substantive evidence. (Evid. Code, §§ 770, 1235.)

It further appears that the fact that defendant had made false, exculpatory statements to the police was properly established *independently* of the erroneously received statements. At the time of his arrest four hours after the homicide, defendant stated that the wound on his forearm had been suffered while at work and that he did not know the source of blood spattered on his car door. Such extrajudicial statements were properly received and established as false when defendant testified contrary thereto. Defendant's credibility was thus independently impugned and the futher damage, if any, suffered by the erroneous receipt of additional false exculpatory statements, one of which merely repeated an earlier statement, must be discounted.

We conclude, in view of the foregoing, that the error in failing to suppress defendant's extrajudicial statements made without a proper *Miranda* admonition was, as to the assault with a deadly weapon conviction, harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

The judgment is reversed as to the manslaughter conviction (count II), and is affirmed as to the assault with a deadly weapon conviction (count I).

Tobriner, Acting C. J., Mosk, J., Clark, J., Richardson, J., Sullivan, J.,* and Ault, J.,† concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.