[Crim. No. 31052. Second Dist., Div. Five. July 31, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID FRANK MAYNARICH, Defendant and Appellant.

## COUNSEL

Paul Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Aurelio Munoz and Mary Ellen Baldridge, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Lawrence P. Scherb II and Carol Slater Frederick, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—After a court trial, defendant was convicted of murder in the second degree and was sentenced to state prison.

### FACTS

On May 24, 1976, the body of John Klinkroth was discovered lying halfway out of bed in his Los Angeles apartment. Death had been caused by multiple stab wounds to the neck and spinal cord. Defendant's palm print and fingerprint were found in the apartment. A note inscribed "No faggot fucks with me (signed) The Hun" was on the dining room table. On May 24 and 25 defendant charged purchases using the victim's credit cards in Bakersfield and Yosemite, California. On May 25 he used the victim's card in Reno, Nevada. Defendant checked into the Holiday Inn in Reno, Nevada on May 25 using the victim's name and on May 26, 1976, he was issued a traffic citation in Reno, Nevada. He had been driving the victim's car.[1]

---

[1]This citation apparently focused suspicion on defendant as Klinkroth's murderer.

On September 17, 1976, Los Angeles Police Officer Witowski saw a station wagon traveling on Wilshire Boulevard in which the driver appeared to be drinking from a beer bottle. Witowski pulled the car over, at which point defendant, a passenger in the car, walked over to the police vehicle and stated "I was just hitchhiking, I wasn't doing anything."

Witowski did a field interview of defendant and ran a warrant check on him. Witowski learned that there was an arrest warrant outstanding for defendant and that he was wanted on a murder charge. Defendant was placed under arrest.

Witowski placed defendant in the police car and read him his *Miranda* rights. Defendant waived his right to remain silent, but when asked if he wished to have an attorney present, he indicated that he did. Witowski then informed him that he was under arrest for murder. Defendant responded, "Oh, you mean he died."[2] Witowski did not question him further.

Defendant was taken into custody and, on September 20, 1976, at 9:15 a.m., Investigator Michael Lambert again advised him of his *Miranda* rights. Defendant again waived his right to remain silent, but when informed of his right to have an attorney present, stated that he did not have an attorney. Lambert told him that an attorney would be appointed for him. Defendant stated, "But will it make a difference?" Lambert said: "Well, that's your choice. You understand that you are entitled to an attorney?" Defendant said: "Yes." Finally, defendant stated, "Well, I'll need one, but, you know, you can go ahead and ask me questions." He then explicitly waived his right to have an attorney present. A taped interview ensued. Its admissibility is the main issue on this appeal.

Defendant stated that he had been hitchhiking to Los Angeles and Klinkroth had picked him up. Klinkroth invited defendant to spend the night at his apartment and defendant accepted.

At the apartment, the two men had some drinks and bathed in the Jacuzzi. They then had some more Scotch. Eventually, Klinkroth made sexual overtures to defendant. Defendant declined the advances and Klinkroth began masturbating on the floor, saying "Maybe you'll feel like it in the morning." Klinkroth then went to bed.

---

[2] The admissibility of this spontaneous statement by defendant is not attacked on appeal.

Defendant went to sleep on the couch across from Klinkroth's bed. In the early morning hours, he awoke and removed a knife from his overnight bag. He then stabbed Klinkroth four or five times in the back of the head. He did not know why he had stabbed Klinkroth, stating that he was not that kind of a person and "figured it was the Scotch." He then took Klinkroth's wallet and car keys and he wrote a note which he left on the dining room table.[3] Defendant then left the apartment and drove Klinkroth's car to Yosemite and then to Reno, where he abandoned it.

## DISCUSSION

On appeal defendant attacks the admission of his statement to Investigator Lambert on two grounds: First, after he asserted his privilege on September 17, the police could not lawfully subject him to a new interrogation on September 20. (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 238 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625]); second he asserts that even on September 20 he "clearly invoked his right to consult with an attorney" and that his statement is therefore inadmissible, regardless of what had happened on September 17.

■  As far as the *Fioritto-Pettingill* point is concerned, it simply is not available to defendant. At no time did his trial counsel object to the admission of the September 20 statement by referring to what had happened three days earlier. Had there been an invocation of *People* v. *Fioritto, supra,* we might have learned what brought Lambert and defendant together on the 20th. For all we know that interview was voluntarily initiated by defendant himself and therefore would have passed muster even under *Fioritto.* (*Id.,* p. 719.)

We appreciate that *Pettingill* had, of course, not been decided at the time of trial and, in the meanwhile, the United States Supreme Court had disagreed with *Fioritto* in *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321]. That, however, cannot excuse the lack of an objection. Defendant cannot have it both ways: if he would substantively rely on "the authority of the courts of this state to construe provisions of the California Constitution to furnish greater protections to our citizens than do textually parallel provisions of the federal Constitution . . ." (*People* v. *Pettingill, supra,* 21 Cal.3d at p. 247) he must not ignore the procedural niceties necessary to trigger the rule he wishes to invoke.

---

[3]This was presumably the note signed by "The Hun." The prosecution did not otherwise authenticate the note as having been written by defendant.

The only objection to the admission of the September 20 statement made was that defendant had indicated his desire to consult an attorney and that questioning should, therefore, have ceased. (Cf., *In re Michael C.* (1978) 21 Cal.3d 471, 477-478 [146 Cal.Rptr. 358, 579 P.2d 7]; *People* v. *Pettingill* (1978) *supra,* 21 Cal.3d 231, 237-241 and cases cited therein.) It has no merit.

■ We have carefully compared the transcript of the discussion between Investigator Lambert and defendant with the interrogations and responses which in the cited and other cases have led to holdings that the suspects in question had indicated their desire to invoke their Fifth Amendment privilege by consulting counsel. We find that the facts of this case fall far short of any precedent we have found. Defendant merely wanted to know whether it would make a difference if he gave up his right to have an attorney present—a question which Lambert properly would not answer because he could not. When defendant made the ambiguous statement that he would need an attorney but that the officer could go ahead and ask him questions, Lambert then specifically asked whether defendant was giving up his right to an attorney and defendant answered in the affirmative.

■ Finally, even if the statement should not have been admitted, the error was not prejudicial per se. The Attorney General claims, correctly we believe, that the statement was merely an admission, in which event the error is presumed prejudicial unless the People demonstrate beyond a reasonable doubt that the error did not contribute to the conviction. (*People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) A confession is defined as "a complete and express acknowledgement of the crime charged" (*People* v. *Morse* (1969) 70 Cal.2d 711, 721 [76 Cal.Rptr. 391, 452 P.2d 607]), a statement in which the defendant "disclos[es] his guilt of the charged offense and which exclud[es] the possibility of a reasonable inference to the contrary." (*People* v. *Jones* (1965) 237 Cal.App.2d 499, 502 [47 Cal.Rptr. 40]; *People* v. *Beverly* (1965) 233 Cal.App.2d 702, 712-713 [43 Cal.Rptr. 743].) However, when the statement contains facts which amount to a claim of mitigation, justification or excuse, it is an admission rather than a confession. (*People* v. *Fowler* (1918) 178 Cal. 657, 664-665 [174 P. 892]; *People* v. *Luzovich* (1932) 127 Cal.App. 465, 469 [16 P.2d 144].) In both *Fowler* and *Luzovich,* the defendants admitted having committed a homicide, but each claimed that their actions were done in self-defense. The statements were held to be admissions.

The taped statement has been carefully examined by us. In it defendant emphasized that he and Klinkroth had been drinking Scotch before they went to sleep. He stated that he "just woke up" and stabbed Klinkroth with a knife. He did not know "if it was the drinking or what." He was "not mad at [Klinkroth] whatsoever"; they were "getting along fine." Defendant did not know why he had stabbed Klinkroth—he (defendant) was "not that type of person." He had never done anything like this before. Several times he stated that "it just happened." Finally, when asked how such a thing could have happened, he stated that he "figured it was the Scotch."

■ What all this leads up to is the question whether defendant's statement was a full and complete confession to murder, or whether implicit in the statement was an assertion that his voluntary ingestion of alcohol caused him to be so intoxicated as to be unable to harbor the requisite mental state of "malice aforethought." (See *People* v. *Conley* (1966) 64 Cal.2d 310, 322-323 [49 Cal.Rptr. 815, 411 P.2d 911].) In *Conley,* the relationship between diminished capacity and malice aforethought was explained as follows: "An intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified. In this respect it is immaterial that he does not know that his specific conduct is unlawful, for all persons are presumed to know the law including that which prohibits causing injury or death to another. An awareness of the obligation to act within the general body of laws regulating society, however, is included in the statutory definition of implied malice in terms of an abandoned and malignant heart and in the definition of express malice as the deliberate intention unlawfully to take life." (*Id.,* at p. 322.)

The essence, then, of the concept of "malice aforethought" is the defendant's "awareness of the obligation to act within the general body of laws regulating society." ■ Although defendant in his statement did not explicitly articulate the lack of that awareness at the time the homicide was committed, the only reasonable interpretation of the statement is that he was claiming that the ingestion of Scotch had so substantial an effect upon him that his capacity for volitional control and moral judgment were substantially impaired. Specifically, the statement

contained assertions that: (1) the homicide was spontaneous and unintentional ("it just happened"); (2) the homicide was totally uncharacteristic of him (he had never done anything like it before and he was not "that type of person"); (3) defendant did not know why he had committed the act and the causative agent "must have been the Scotch."

In assessing the effect of intoxication upon a defendant's ability to harbor the requisite mental state, we are always ". . . faced with a continuum rather than a series of clearly defined alternatives: except in extreme situations no law tells us just how much effect on premeditation negates first degree murder, or to what extent the capacity to harbor malice must be lessened before the crime is not even murder of the second degree." (*People* v. *Garcia* (1972) 27 Cal.App.3d 639, 647 [104 Cal.Rptr. 69].) Since the statement contains a reasonable inference that is inconsistent with defendant's guilt of murder, it is an admission and not a confession and the *Chapman* rule of harmless error applies. (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Applying that rule, we note that the circumstantial evidence against defendant was overwhelming. In fact, the presence of his fingerprints at the scene and his possession of the victim's car and credit cards immediately after the homicide provided a substantial factual basis for a finding of first degree murder on a robbery-murder theory. The case against defendant was made airtight when, after being told he was under arrest for murder, he spontaneously asked, "You mean he died?" The bare bones defense consisted of testimony of family and friends that defendant is a "good person" and had not exhibited homosexual tendencies. On this record, we do not have the slightest doubt that the statement did not contribute to the conviction.

Defendant's contention that he was denied due process because the court reporter failed to transcribe the taped statement is without merit. As noted above, we have had a full opportunity to listen to the taped statement numerous times. A written transcription is as subject to destruction and distortion as an electronically recorded tape. In fact, where the evidence under consideration is a tape-recorded statement, the tape itself is preferable to a transcription since it eliminates the intermediary step of the court reporter. While we can imagine problems

in a case where the tape is lost or destroyed, no conceivable prejudice has been shown in the instant case.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied August 17, 1978, and appellant's petition for a hearing by the Supreme Court was denied September 27, 1978.