[Crim. No. 34622. Second Dist., Div. One. Dec. 3, 1980.]

In re ALBERT R., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ALBERT R., Defendant and Appellant.

COUNSEL

Paul A. Turner, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Juliet H. Swoboda and Cynthia Sonns Waldman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

JEFFERSON (Bernard), Acting P. J.*—In this case the juvenile court sustained a petition (Welf. & Inst. Code, § 602) charging Albert R., a minor, with receiving stolen property and grand theft. The court committed the minor to the California Youth Authority. He appeals from the order sustaining the petition and committing him to the Youth Authority.[1]

I

*A Summary of the Facts*

In April of 1978, a brown 1967 two-door Volkswagen sedan was stolen from Eric Rosenberg. In August of 1978, California Highway Patrol Officer Ortiz received information that a silver Volkswagen, then in the possession of James Hackett, had been sold to Hackett by Albert R., the minor before us, and was possibly a stolen vehicle on which the vehicle identification number (VIN)[2] had been switched with that of another vehicle.

Hackett purchased the Volkswagen from Albert on May 23, 1978, for $1,500; Albert told Hackett that he "had it [the car] four years." After examining the vehicle, Officer Ortiz concluded that it was a disguised stolen automobile; that a "bellypan switch" had been effected

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1]Originally, on this appeal by a divided court, we affirmed the orders sustaining the petition and committing the minor to the California Youth Authority and filed our opinions on June 6, 1980. The California Supreme Court granted the minor's petition for hearing and retransferred the cause to us for reconsideration in light of *Rhode Island* v. *Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682].

[2]In a 1967 Volkswagen, the VIN number is found in two places: on a plate, referred to as a VIN plate riveted in the luggage compartment, and stamped into the bellypan of the vehicle which is located underneath the rear seat. The "bellypan switch" is one method used to disguise stolen vehicles.

and the VIN plate in the luggage compartment had been removed. Officer Ortiz subsequently traced the VIN number on the bellypan and the license number on Hackett's vehicle to a Volkswagen registered to Albert, the minor. Later, Ortiz traced the engine identification number on Hackett's vehicle to the engine number for the stolen Rosenberg Volkswagen. Rosenberg subsequently positively identified the automobile in Hackett's possession as the one which he owned and had reported stolen.

On January 2, 1979, after attempting to locate Albert for several months, Officer Ortiz received information that Albert was at his girl friend's house; he proceeded there and waited; when Albert left, Officer Ortiz had a black and white patrol car stop and arrest him.

Albert did not take the stand at the juvenile court adjudication hearing, but his aunt testified that in March 1978, he had a Volkswagen fall on his head and thereafter he had blackouts and appeared to be in a daze.

## II

*The Question of Whether the Minor's*
*Inculpatory Statement Was Obtained*
*by Police Interrogation in Violation*
*of the Miranda Rule*

The only contention advanced by the minor, Albert, on this appeal is that his inculpatory statement, introduced at the adjudication hearing, was obtained from him by a police interrogation in violation of his *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights. The minor relies principally upon the interpretation of forbidden interrogation announced in *Rhode Island* v. *Innis, supra*, 446 U.S. 291.

We now consider the evidence regarding the minor's inculpatory statement.

Officer Ortiz testified that Albert was arrested at 6:45 p.m., and shortly thereafter on the freeway in the back seat of the patrol car, he read to Albert his *Miranda* rights; Albert said he understood them. Asked by Officer Ortiz if he wished to answer questions regarding the

case without an attorney present, Albert responded that "he didn't have anything to add or to say." At this point Officer Ortiz said he ceased efforts to talk to Albert and discontinued questioning him. During the next hour Ortiz transported Albert to the highway patrol station where he was fingerprinted and photographed, and then to the county jail where he was booked.

But Ortiz testified that, while en route from the point of the *Miranda* warnings to the highway patrol station, there was conversation between Ortiz and Albert—that Ortiz was "asking him [Albert] where he had been all this time, why he hadn't gotten ahold of me." Ortiz described this conversation as just chitchat.

After leaving the highway patrol station, and on the way to county jail, Ortiz said that he was telling Albert what to expect when they got to the jail—that he would be booked and be in county jail for a while; that subsequently charges would be filed and Albert would go to court. Ortiz said he also began telling Albert that he was a terrible person, was not very bright because he kept committing crimes and kept getting caught; that his big mistake and the way he got caught this time was having the same girl friend and returning back to her. In referring to his background, Ortiz said he told Albert: "That was sure a cold thing you did to Jim Hackett, selling him that hot car." Ortiz testified that in response to this last statement of Ortiz, Albert said: "Yes, but I made the money last. I'm using the last of it now."

We recognize that Officer Ortiz testified that, in continuing to have conversation with Albert after the latter had been given *Miranda* warnings and replied that he had nothing to say or add, Ortiz did not intend to elicit any incriminating responses from Albert, did not consider his continuing conversation with Albert as any interrogation or attempt to probe information from Albert concerning the offense for which he was arrested.

The issue before us is whether Officer Ortiz' conversation with Albert, although labelled chitchat by Ortiz, nevertheless constituted a forbidden custodial interrogation within the meaning of *Miranda* and *Innis*.

The *Miranda* court made clear that, prior to any custodial interrogation, a suspect must receive the specific warnings set forth in that

case in order to preclude jeopardization of the privilege against self-incrimination. The warnings are (1) that he has a right to remain silent, (2) that anything he might say can be used against him in court, (3) that he has the right to the presence of an attorney, and (4) that if he cannot afford an attorney, one will be appointed for him prior to any interrogation if he so desires.

Although the *Miranda* court recognized that, after receiving such warnings, a suspect may knowingly and intelligently waive those rights and decide to answer questions or make a statement, the court emphasized that "unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (*Miranda, supra*, 384 U.S. 436, 479 [16 L.Ed.2d 694, 726]; fn. omitted.)

The issue presented in *Innis* and the case before us, involves the matter of the meaning of custodial *interrogation* within the context of the *Miranda* opinion. The *Miranda* court made the observation that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra*, 384 U.S. 436, 444 [16 L.Ed.2d 694, 706].) (Italics added; fn. omitted.)

The *Innis* court rejected any suggestion that the *Miranda* rules were meant "to apply only to those police interrogation practices that involve express questioning of a defendant while in custody." (*Innis, supra*, 446 U.S. 291, 298 [64 L.Ed.2d 297, 306].) ▮ Thus, *Innis* teaches that custodial interrogation includes not only express questioning but *implied* questioning as well. The *Innis* court used the following language to amplify the meaning of "interrogation" as used in *Miranda*: "We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Innis, supra*, 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308]; fns. omitted.)[3]

---

[3]In a footnote, the *Innis* court explained that the term "incriminating response" was intended to refer to any response—exculpatory as well as inculpatory—that the pros-

It is clear, therefore, that police statements may amount to custodial interrogation without being phrased in questioning form. A good example of nonquestioning custodial interrogation is found in *Brewer* v. *Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232]. In *Brewer*, defendant was charged with the murder of a 10-year-old child. While transporting the defendant by automobile between Davenport, Iowa and Des Moines, Iowa—a distance of 160 miles—a police detective made to the defendant what was described as the "Christian burial speech." The detective told defendant that snow was predicted and that he felt that defendant was the only person who knew where the little girl's body was and that if snow covered the body they might not be able to find it and that "'I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all.'" (*Brewer, supra*, 430 U.S. 387, 393 [51 L.Ed.2d 424, 433].)

The *Brewer* court characterized this statement of the police detective to the defendant as an "interrogation" by observing that "[t]here can be no serious doubt" that the detective "deliberately and designedly set out to elicit information from Williams [the defendant] just as surely as—and perhaps more effectively than—if he had formally interrogated him." (*Id.* at p. 399 [51 L.Ed.2d at pp. 436-437].)

In the case at bench it is abundantly clear that, after receiving the *Miranda* warnings, the minor, Albert, clearly invoked his right to remain silent by stating, in unqualified language to Officer Ortiz that "he didn't have anything to add or to say." The *Miranda* court set forth the procedure to be followed after a suspect has indicated his desire to remain silent by stating: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Miranda, supra*, 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723].) Thus, after indicating his desire to remain silent, the minor was entitled to have all interrogation efforts cease (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 240-241 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 238 [137

---

ecution might seek to introduce as relevant evidence at trial. (*Innis, supra*, 446 U.S. 291, 301, fn. 5 [64 L.Ed.2d 297, 308].)

Cal.Rptr. 171, 561 P.2d 261]; *People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585]), as well as any new efforts of Officer Ortiz to get him to communicate with him about the case. (*People* v. *McClary* (1977) 20 Cal.3d 218, 226 [142 Cal.Rptr. 163, 571 P.2d 620].)

■ We recognize also that, even though the minor was in custody, he had the option to change his mind and voluntarily make a statement (*People* v. *McClary, supra,* 20 Cal.3d 218, 226-227) and that, if he made a statement and "'such [statement was] the result of [his] own initiative and did not arise in a context of custodial interrogation'" (*People* v. *Randall* (1970) 1 Cal.3d 948, 956, fn. 7 [83 Cal.Rptr. 658, 464 P.2d 114]), it should not be proscribed by *Miranda.*

■ The pivotal issue before us, therefore, is whether Officer Ortiz' statements to the minor constituted custodial interrogation within the meaning of *Innis,* so that the minor's inculpatory statement which followed must be excluded from reception into evidence as a violation of the *Miranda* rules. We conclude that Officer Ortiz' statements to the minor constituted custodial interrogation within the meaning of *Innis* and that it was error, therefore, for the trial court to admit evidence of the minor's inculpatory statement as constituting a voluntary statement and not the product of illegal interrogation.

The focus of our inquiry is on the *Innis* rule that there is custodial interrogation under *Miranda* whenever there are words or actions on the part of the police "that the police *should* know are *reasonably* likely to elicit an incriminating response from the suspect" (*Innis, supra,* 446 U.S. 291, 301 [64 L.Ed.2d 297, 308]) (italics added; fns. omitted), such words or actions on the part of the police constitute the "functional equivalent" of express questioning of a suspect by the police.

In the case before us, we have a situation in which Albert, the minor, made it clear to the officer that he did not want to talk by responding to the *Miranda* advisement in unqualified language that "he didn't have anything to add or to say." And yet within approximately one hour of defendant's exercise of his constitutional privilege, Officer Ortiz and the minor engaged in a conversation en route to Los Angeles County jail. The officer testified that although he could not remember who started this conversation, it might have occurred because he told defendant what would happen to him in the jail, either spontaneously or in response to defendant's inquiry.

It was in the course of that conversation that Officer Ortiz asked Albert where he had been during the months Ortiz had been looking for him. Ortiz told Albert that the latter's "big mistake and the way he got caught was having the same girlfriend and returning back to her." Officer Ortiz testified that he continued "telling him that he wasn't very smart because he kept getting caught" and that "he had been a terrible person." Officer Ortiz then stated to Albert in unequivocal accusatory language: "That was a cold thing you did to Jim Hackett, selling him that hot car." To this accusation, the minor responded: "Yes, but I made the money last. I'm using the last of it now."

As set forth previously herein, by indicating that he had nothing to say to Officer Ortiz, Albert clearly invoked his right to remain silent. (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 718-719 [68 Cal.Rptr. 817, 441 P.2d 625].) At that point, further *conversation* concerning his arrest or the charges against him should have ceased. (*People* v. *Enriquez, supra*, 19 Cal.3d 221, 237-238.) Officer Ortiz' continued discussion with Albert, including a direct accusation that Albert had knowingly sold to Jim Hackett a stolen car and describing it as a cold-blooded act, constituted words that Officer Ortiz *"should have known were reasonably likely to elicit an incriminating response."* (*Innis, supra*, 446 U.S. 291, 302 [64 L.Ed.2d 297, 308].) (Italics in original.)

██ ██▄█ ██ The accusatory words used by Officer Ortiz to the minor, Albert, are very similar to the accusatory words used by the detective to the defendant in *Brewer, supra*, 430 U.S. 387, and, as in *Brewer*, must be considered as the functional equivalent of express interrogation and calculated to result, as it in fact did, in the procurement of an inculpatory statement.[4]

An instructive case on the issue before us is *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050].) In *Honeycutt*, after his arrest, he was not advised of his *Miranda* rights. The officers engaged him in a discussion about the victim degrading him as a homosexual for the express purpose of trying to get him to talk; in

---

[4]The *Innis* court emphasized that the definition of "interrogation" which encompasses both express interrogation and also the "functional equivalent" of express interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police" (*Innis, supra*, 446 U.S. 291, 301 [64 L.Ed.2d 297, 308]), although the court adds that "[t]his is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." (*Id.* at p. 301, fn. 7 [64 L.Ed.2d 297, 308].)

fact the officer testified: "'It was my duty to continue the efforts to try to get him to talk. And I was successful in it.'" (*Honeycutt, supra,* 20 Cal.3d 150, 158.) Three hours after his arrest Honeycutt was advised of his *Miranda* rights after he indicated he would talk about the homicide. Clearly the conversation was *intended* by the officer to elicit a confession from the very inception of the conversation, and Honeycutt's decision to waive his *Miranda* rights was induced prior to being given the *Miranda* admonitions.

In the case at bench, we are unable to find that Officer Ortiz *intended* to obtain an inculpatory response from the minor. But *Innis* holds that such an intent by the police is *not* required for the concept of custodial interrogation. It is the reasonable likelihood of the police words or conduct eliciting an incriminating response that is of significant import.

Although we must view the uncontradicted evidence in the light most favorable to the trial court's ruling (*In re Dennis B.* (1976) 18 Cal.3d 687 [135 Cal.Rptr. 82, 557 P.2d 514]), we are compelled, nevertheless, to conclude that the trial court's ruling was erroneous. We agree with the trial court's characterization of the officer's statement as not "subtle or psychological attempts to get this minor to attempt to talk further."[5] There was nothing subtle about the officer's statements to defendant. They were blatantly and flagrantly accusatorial. As such, Officer Ortiz should have known that his accusations were reasonably likely to obtain inculpatory statements from Albert, the minor.

### III

*The Prejudicial Effect of the Error
in Admitting the Minor's
Inculpatory Statement*

We turn next to a consideration of the standard by which the effect of the error herein involved will be considered as prejudicial or not. This standard looks to the question of whether the illegally obtained statement is tantamount to a confession or constitutes a mere admission. "A confession is defined as 'a complete and express acknowledgement of

---

[5]The trial judge remarked: "It certainly doesn't appear from what's been testified to that there was any subtle or psychological attempts to get this minor to attempt to talk further about this matter, and there were statements made, nothing further. He did not elicit any responses. Any responses given would have to be voluntary."

the crime charged' [citation], a statement in which the defendant 'disclos[es] his guilt of the charged offense and which exclud[es] the possibility of a reasonable inference to the contrary.'" (*People* v. *Maynarich* (1978) 83 Cal.App.3d 476, 481 [147 Cal.Rptr. 823].) A confession erroneously received in evidence is deemed to be prejudicial per se and requires a reversal regardless of the other evidence of appellant's guilt. (*People* v. *Disbrow* (1976) 16 Cal.3d 101, 115-116 [127 Cal.Rptr. 360, 545 P.2d 272].) Since the substance of the minor's statement in this instance impliedly admitted the elements of the crimes of which he was charged, it amounted to a confession.

The orders appealed from are reversed.

**LILLIE, J. and HANSON (Thaxton), J.**—We concur under compulsion of *Rhode Island* v. *Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682].