[Crim. No. 32281. Second Dist., Div. Four. May 16, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT JAMES WILLIAMS, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Jonathan B. Steiner and William Wesley Patton, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, and Robert H. Philibosian, Chief Assistant Attorneys General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow, Howard J. Schwab and Lawrence P. Scherb, II, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JEFFERSON (Bernard), J.**—Defendant appeals from a judgment convicting him of two counts of forcible rape in violation of Penal Code sections 261, subdivision 2 and 261, subdivision 3.

In an original information, defendant was charged in one count with committing forcible rape in violation of Penal Code sections 261, subdivision 2 and 261, subdivision 3, by acting in concert with codefendants Robert Boyd and Malcolm Hardaway. In a second count, defendant, along with codefendant Hardaway, was charged with committing the felony offense of kidnaping in violation of Penal Code section 207. In a third count, defendant, along with codefendants Boyd and Hardaway, was charged with committing a violation of Penal Code section 288a through aiding Boyd to perform an act of forcible oral copulation with the victim. The victim of the three charged offenses was Rebecca, a female, and the date of the alleged offenses was June 7, 1976. After a trial by jury on the original information, a mistrial was declared on May 18, 1977, because the jury could not arrive at a verdict as to defendant Williams.[1]

After the mistrial, the information was amended so that defendant was charged in one count with personally raping Rebecca and, in another count, with aiding and abetting Hardaway in the latter's rape of Rebecca. Defendant was convicted by the jury of both these offenses but found not guilty of the kidnaping and oral copulation charges. Defendant was sentenced to state prison for the term prescribed by law, with the sentences on the two counts ordered to run consecutively.

I

*The Factual Background*

On the evening of June 6, 1976, Rebecca, who lived in Orange County, drove alone to the Forum in Inglewood in Los Angeles County to attend a concert. When she left the Forum to return home, she got lost and stopped at a liquor store at the corner of Florence Avenue and Hoover Street in Los Angeles to seek directions to the freeway. The store was closed. As she turned to go back to her car, she was struck in the stomach and her purse was snatched. She saw someone running down the alley with her purse. Her car keys were in the purse and she had locked the car.

Rebecca was lent a dime to make a phone call. She went into a nearby phone booth and called a friend, Linda, who suggested that she call

---

[1]However, the jury found Boyd guilty of oral copulation and Hardaway guilty of rape with the use of a firearm within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1). Another person, Philip Waters, was originally charged as a codefendant but his case was disposed of before the joint trial of codefendants Williams, Boyd and Hardaway.

Linda's brother, Larry. Defendant came up and said he would help get her purse back. She declined the offer of help but defendant took her by the arm and forced her into the front seat of a car between defendant, the driver, and another male seated on the passenger side. She screamed as she was pushed into the car.

Rebecca was driven around for awhile and ultimately the vehicle stopped at a house. She was forced to enter the house where she saw several males, including Hardaway, Waters and Boyd. Hardaway struck her in the nose, causing her nose to bleed. Defendant took her into a bedroom, removed her clothes, and forced her to have sexual intercourse with him. Hardaway came into the bedroom and he forced her to have sexual intercourse with him. While Hardaway was having intercourse with her, Boyd came in and forced her to orally copulate his penis. She was slapped a number of times during this sexual mistreatment.

Rebecca said that the next thing she remembered was the sun coming up and that defendant came into the room and helped her find her clothes. After she got dressed, Hardaway put a pillow case over her head and she was taken out of the house, placed in the front seat of a car and driven around for a period of time. She was then shoved out of the car into the street with the pillow case still over her head. Removing the pillow case, she began walking, ending up at a Jerseymaid Dairy. The police were called. Rebecca was taken to a hospital for examination. She was taken to a lot where she identified the vehicle which she had been forced to enter.

Although defendant did not testify, his defense was that Rebecca had voluntarily gotten into Hardaway's car so that they could help her recover her purse; that Rebecca had voluntarily entered the residence where the alleged sexual offenses were committed but that no sexual acts took place.

## II

### Defendant's Contentions of Error

Defendant asserts that the following errors occurred below: (1) The trial court erred in finding that Rebecca, the rape victim, was unavailable as a witness for the second trial to make admissible her first trial testimony as former testimony. (2) It was error for the trial court to deny defendant's discovery motion for notes of the prosecutor regarding his interview with Rebecca, the victim. (3) It was error for the trial court to

deny defendant's evidence suppression motion inasmuch as the evidence seized was the product of defendant's illegal warrantless arrest. (4) Evidence of incriminating statements made by defendant to the police was inadmissible because secured in violation of his *Miranda* rights. (5) Defendant was denied a fair trial by having the codefendants from the first trial brought into court wearing jail clothes during the reading of the rape victim's first-trial testimony, during a police officer's testimony and during the prosecution's closing argument.

## III

### The Finding of the Rape Victim's Unavailability as a Witness to Make Admissible Her First-Trial Testimony Under the Former Testimony Exception to the Hearsay Rule

Rebecca, the rape victim, testified at the first trial of defendant and codefendants Boyd and Hardaway. As indicated previously herein, these two codefendants were convicted but a mistrial was declared as to defendant after the jury could not reach a verdict as to defendant's guilt or innocence of any of the charges alleged in the information. The mistrial was declared on May 18, 1977. The second trial against defendant alone was started on November 7, 1977. Jury selection was completed on November 9, 1977. On November 15, 1977, the trial court conducted a hearing to determine whether Rebecca was unavailable as a witness. As a result of the hearing the court determined that Rebecca was unavailable as a witness within the meaning of Evidence Code section 240, subdivision (a)(3), as being unable to testify because of her "then existing physical or mental illness or infirmity." Rebecca's testimony at the first trial was then read to the jury from the reporter's transcript of her testimony. Defendant asserts that the trial judge's ruling was erroneous, an abuse of discretion, and in violation of his constitutional witness-confrontation rights.

At the hearing on witness unavailability, one witness was the judge who presided at the first trial of defendant and the codefendants. The judge testified that Rebecca had testified for six days and that, during this time, her hands and legs were shaking and she was obviously under severe emotional strain; that on an initial occasion she collapsed as soon as she entered the courtroom; however, he did not observe any further collapses during her six days of testimony. The judge testified that the physician who examined Rebecca at the emergency hospital testified at

the first trial that she had colitis and that one of the symptoms can manifest itself in fainting spells on occasion. But no testimony was offered at the evidentiary admissibility hearing as to whether Rebecca still had colitis or was suffering any bad effects.

Another witness at the evidentiary admissibility hearing was a police officer who testified about her physical condition when he saw her on June 7, 1976, the morning after the sexual attacks. Barbara Levy, a friend of Rebecca's, testified that she accompanied Rebecca to court every day during the first trial. Barbara described the physical and emotional strain exhibited by Rebecca during the period of the first trial. Barbara testified that, after the first trial, Rebecca put on weight and seemed happy. Barbara stated that she talked with Rebecca shortly before the instant trial was to commence and Rebecca stated that she had heard that the case was to be retried and that she felt she would fall apart if she had to go through another trial. On the day before Barbara testified at the evidentiary admissibility hearing she talked with Rebecca and Rebecca made the comment: "Barbara, I can't go through with that again. I can't. I want to put my life together and go on. I am being torn apart."

Another witness at the hearing was Nick Jury, Rebecca's boyfriend at the time of the sexual assaults and at the time of his testimony. He testified that Rebecca had become hysterical upon learning that she had to go back to court for another trial; that she told him that she didn't want to see anybody involved with the trial again and didn't want to come to court under any circumstances. Nick Jury also testified that, although Rebecca went down in weight from approximately 120 pounds, her normal weight, to less than 100 pounds during the first trial, she was now weighing approximately 125 pounds.

No medical evidence was offered by the prosecution as to Rebecca's physical and emotional condition at the time of the hearing or as to any probable effects upon her health if she were required to come to court and testify at defendant's trial then in progress.

The question before us is whether the evidence presented at the evidentiary admissibility hearing was sufficient to sustain the trial court's ruling that Rebecca was unavailable as a witness within the meaning of Evidence Code section 240, subdivision (a)(3), which defines this element of witness-unavailability in terms of a declarant who is unable to testify at the trial "because of then existing physical or mental illness or infirmity."

■ The burden of proving that a hearsay declarant is unavailable as a witness is upon the prosecution. (*People* v. *Enriquez* (1977) 19 Cal.3d 221 [137 Cal.Rptr. 171, 561 P.2d 261].) Although the *Enriquez* court did not declare the degree of this burden of proof, we assume that the degree is proof by a preponderance of the evidence. (See Evid. Code, § 115; *People* v. *James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135] [proof by preponderance of the evidence on prosecution to establish justification for a warrantless arrest under some recognized exception to the warrant requirement].) ■ The proof of witness-unavailability must be made by *competent* evidence (*Enriquez, supra,* 19 Cal.3d 221; *People* v. *Green* (1963) 215 Cal.App.2d 169 [30 Cal.Rptr. 83]), which means that the exclusionary rules such as the hearsay, best evidence and opinion rules apply to the evidence offered at a hearing to determine this issue of declarant's unavailability as a witness. (*Green, supra,* 215 Cal.App.2d 169, 171.)

It is to be noted that the bulk of the testimony at the hearing on witness unavailability in the instant case set forth statements made by the declarant Rebecca. Evidence of these statements was properly admissible as either nonhearsay because the statements were offered to prove—not their truth—but the state of mind of declarant by inference from her express statements (see Jefferson, Cal. Evidence Benchbook (1972) Hearsay and Nonhearsay, § 1.6, pp. 24-27; (1978 supp.) pp. 26-28), or hearsay under the exception to the hearsay rule for evidence of statements of declarant's then existing state of mind or physical sensation offered to prove the concurrent, prior or subsequent state of mind or physical sensation as an issue in the action. (Evid. Code, § 1250, subd. (a)(1); Jefferson, Cal. Evidence Benchbook (1972) Exceptions to the Hearsay Rule, § 14.1, pp. 165-171.)

It is the People's position that, even though there was no testimony from Rebecca, the declarant, nor from a physician or psychiatrist, the evidence presented by the prosecution at the witness-unavailability hearing was sufficient to justify the trial court's finding that Rebecca was unable to testify at defendant's trial—then in progress—because of a then existing *mental infirmity*. The People rely primarily upon *People* v. *Rojas* (1975) 15 Cal.3d 540 [125 Cal.Rptr. 357, 542 P.2d 229] and *People* v. *Quaintance* (1978) 86 Cal.App.3d 594 [150 Cal.Rptr. 281].

In the *Rojas* case, a declarant—who testified at defendant's preliminary hearing and first trial—testified at a witness-unavailability hearing that he had received threats and feared for his life and that of his family and,

consequently, that he was refusing to testify at defendant's second trial. He persisted in his refusal to testify, was held in contempt, and sent to juvenile hall for the duration of the trial. The *Rojas* court held that a mental state, induced by fear for his personal and family safety, which impels a declarant to refuse to testify, constitutes a mental infirmity to make such declarant unavailable as a witness within the meaning of Evidence Code section 240, subdivision (a)(3).

The *Quaintance* case is somewhat similar to *Rojas*. In *Quaintance*, a declarant, who was an accomplice of the defendant, testified at the preliminary examination. He took the stand at defendant's trial but refused to answer any questions, asserting a fear for his life because he had seen others in prison fall because they had testified against a defendant. The *Quaintance* court held that the evidence before the trial judge was such that it could not be said that "the trial court lacked a sufficient evidentiary basis for its finding that [declarant] harbored a genuine fear for his life if he testified in defendant's trial." (*Quaintance, supra*, 86 Cal.App.3d 594, 600.)

We note that the *Quaintance* court gave this interpretation of the *Rojas* holding: "But the significant issue in *Rojas* was not the question of the quantum or type of coercion required to uphold a witness' claim of fear; instead, *Rojas* directs that inquiry be made as to whether the witness suffers the 'mental infirmity' (Evid. Code, § 240, subd. (a)(3) of 'a mental state induced by fear which impels the witness *to refuse to testify.*' [Citation.]" (*Id.*, at p. 600.) (Italics added.)

Defendant argues that the instant case is clearly distinguishable from *Rojas* and *Quaintance*, and that *People* v. *Gomez* (1972) 26 Cal.App.3d 225 [103 Cal.Rptr. 80], is a more pertinent authority for the issue presented before us. In *Gomez*, a 15-year-old female declarant had testified at defendant's preliminary hearing as the victim of a sex crime. At the time of trial she was in Camarillo State Hospital. At an evidentiary admissibility hearing to determine whether her preliminary hearing testimony was admissible as former testimony (Evid. Code, § 1291, subd. (a)(2)), two staff physicians from the hospital—both psychiatrists—gave testimony. One psychiatrist testified that the declarant had a tendency to psychomotor seizures which were very difficult to diagnose and treat, that although she had shown significant improvement, such was rather " 'delicate and tedious,' " and that there was a " 'strong possibility' " that it would be detrimental to her welfare to appear in court; that while at the hospital, she had " 'become rather hysterical with minimal provoca-

tion.' " This psychiatrist concluded that she could become " 'very vulnerable and regressing backwards and wipe out the improvement that she's shown . . . and . . . as her physician, I don't want to risk that happening.' " (*Gomez, supra,* 26 Cal.App.3d 225, 228.)

The other psychiatrist testified that if the declarant had to appear in court he was " 'greatly concerned that it would grossly affect the child's present and possibly future health, mental health' " and that he would be " 'very concerned over the consequences which might ensue from her appearing here under such stress or conditions.' " (*Gomez, supra,* 26 Cal.App.3d 225, 228.)

In holding that the trial judge committed no abuse of discretion in finding from the medical testimony that the declarant was unavailable as a witness by reason of "then existing physical or mental illness or infirmity" (Evid. Code, § 240, subd. (a)(3)), the court took the view that "the illness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness' attendance, or his testifying, *relatively impossible* and *not* merely inconvenient." (*Gomez, supra,* 26 Cal.App.3d 225, 230.) (Italics added.)

That the medical testimony was of substantial significance to the *Gomez* court is seen in its analysis of *People* v. *Bojorquez* (1880) 55 Cal. 463, and *People* v. *Rinesmith* (1940) 40 Cal.App.2d 786 [105 P.2d 1021], in which no medical testimony was introduced. "[O]nly testimony of police officers was offered to show the nature and extent of the illness of the absent witness. This was held to be legally insufficient." (*Gomez, supra,* 26 Cal.App.3d 225, 230.)

In *Sanchez* v. *Bagues & Sons Mortuaries* (1969) 271 Cal.App.2d 188 [76 Cal.Rptr. 372], the trial court found against declarant unavailability as a witness for an 80-year-old deponent of a deposition in a civil case after trial counsel had testified to the deponent's condition. The *Sanchez* court sustained the trial court and emphasized that "[t]here was no testimony of a doctor or nurse that the witness could not appear in court. On cross-examination, plaintiff's counsel admitted that he had not spoken with any doctors of the witness, and admitted he knew of no medical evidence that precluded the witness from being brought to court to testify." (*Id.,* at p. 194.)

█ In reaching a conclusion as to whether a trial judge has correctly determined that a declarant's former testimony has become admissible

because of such declarant's unavailability as a witness, we recognize the principle that "[a] criminal defendant has a right to confront witnesses against him (U.S. Const., 6th and 14th Amends; Cal. Const., art. I, § 15; Pen. Code, § 686), but that right is not absolute." (*Enriquez, supra,* 19 Cal.3d 221, 235.) "[T]here has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." (*Barber* v. *Page* (1968) 390 U.S. 719, 722 [20 L.Ed.2d 255, 258, 88 S.Ct. 1318].)

We conclude that the instant case is too unlike the factual situation in *Quaintance* or *Rojas* for the legal principles of these cases to support the trial court's finding that Rebecca was unable to testify because of a physical or mental infirmity. In both *Rojas* and *Quaintance,* the declarant was present in court and refused to give any testimony on the merits of the case because of a reasonably engendered fear. But there was no evidence of any absolute refusal by Rebecca to testify in the case at bench. At best the evidence established that, understandably, Rebecca, the declarant, did not want to go through another ordeal of testifying, and that it could be anticipated that she would suffer some mental anguish and physical effects from testifying. But the evidence also established that the anguish and physical effects which she suffered from testifying at the first trial were temporary in nature and disappeared upon the conclusion of the first trial.

In the absence of *medical* testimony such as was introduced in *Gomez,* there was no credible evidence presented in the case at bench to support a finding that, if required to testify, Rebecca would suffer any substantial impairment to her mental or physical health—either permanently or for any significant period of time. The instant case is not unlike that of *Sanchez,* in which the absence of medical evidence was held to preclude a finding that a deponent was unavailable as a witness because of physical illness.

Applying the test set forth in *Gomez,* which was referred to but not criticized by our high court in *Rojas,* we hold that the preliminary-facts evidence established only that Rebecca's mental, emotional and physical condition rendered her ability to testify merely inconvenient and *not* "relatively impossible."

It was an abuse of discretion, therefore, for the trial court to find that Rebecca was unavailable as a witness and to admit against defendant

evidence of her first-trial testimony under the exception to the hearsay rule for former testimony provided by Evidence Code section 1291, subdivision (a)(1), which makes the declarant's unavailability as a witness one of the requirements for this exception.

The importance to defendant of having Rebecca, the victim, testify before the jury as the trier of fact in the instant case is patently clear. At the first trial at which Rebecca testified, the jury could not agree on defendant's guilt or innocence although the codefendants were found guilty. Apparently, Rebecca's credibility, insofar as her testimony against defendant was concerned, was not accepted by the jury which saw and heard her testify. It is of significance that, at the hearing to determine Rebecca's unavailability as a witness, Judge Peetris, who presided at the first trial, testified that at times Rebecca "became very flippant in her answers. It seemed to the Court overly so." Thus, the trial court's erroneous ruling finding Rebecca unavailable as a witness must be considered an error of considerable magnitude.

IV

*The Two Suppression-of-Evidence Motions*

Prior to the first trial, defendant made a suppression-of-evidence motion pursuant to Penal Code section 1538.5. This motion sought to suppress a shirt seized by the police at defendant's residence on the ground that his arrest was illegal, and statements of defendant made to the police following his arrest on the grounds that such statements were the fruit of the illegal arrest and, in addition, constituted a violation of defendant's *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) This motion was denied. After the first trial resulted in a mistrial because the jury could not agree on any verdict as to defendant's guilt or innocence, defendant renewed his evidence-suppression motion prior to the second trial. The renewal motion, purportedly made pursuant to Penal Code section 1538.5, subdivision (h), was denied by the trial court on lack of jurisdiction grounds—not on the merits of the motion. Defendant asserts that the trial court erred in both instances in denying his motions to suppress evidence.

██ We consider first, the question of the legality of defendant's arrest. Codefendants Boyd, Hardaway and Waters were arrested first. Police officers were advised by Boyd and his sister, Melanie, that the remaining suspect was defendant who was known as "Bob Williams" or

"Frank Williams" and that he lived in a residence next to that of Hardaway. The officers went to the address specified by the Boyds on June 8, at approximately 6:30 p.m. The officers knocked on the door, identified themselves as police officers and were admitted to the living room by a Cassandra Smith. The officers advised her that defendant Williams was a suspect in a kidnap and rape and they were attempting to locate him. Cassandra told the officers she was the wife of Robert Williams; that he was at work and didn't know when he would return home; that defendant couldn't have been involved in the crimes because he was with her at the time the crimes were committed.

While talking to Cassandra, the officers heard a noise at the rear of the house and walked to the rear, entered a bedroom and saw a man lying on a bed. The man was ordered to get up and then was searched for weapons. Upon being asked who he was, he gave a name other than Williams. Cassandra then advised the officers that the person found on the bed was her lover whom she had while her husband was away from the premises. The officers saw and seized a shirt which resembled the shirt Rebecca described as being worn by defendant. The officers then made the man found in bed leave the premises and go nearby to the residence of the Boyds. He was there identified as Bob Williams, the defendant. The police then placed defendant under arrest and took him to the police station.

It is defendant's position that he was illegally arrested in his home by officers not possessing an arrest warrant contrary to the requirements set forth in *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]. Defendant argues that, since his arrest was illegal, the shirt and his incriminating statements to the police should have been suppressed as the products of the illegal arrest. The principle stated by defendant is established law on the assumption that his arrest was invalid. (*Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].)

The *Ramey* case holds that a warrantless arrest of a suspect within his home is constitutionally impermissible unless certain exceptions come into play. The People assert that defendant's reliance upon *Ramey* is untenable because defendant's arrest did not take place until after defendant had been removed from his home and identified as the suspect, Williams, by the Boyds at the latter's residence. If the *Ramey* holding applies only to a formal arrest (see Pen. Code, § 834, that defines an arrest), defendant's reliance upon *Ramey* is untenable.

■ The decisional law recognizes that a person's restraint by the police may constitute either a detention or an arrest. (See *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957]; *People v. Harris* (1975) 15 Cal.3d 384 [124 Cal.Rptr. 536, 540 P.2d 632].) A detention may be justified on facts short of those necessary to justify a warrantless arrest. (*People v. Mickelson* (1963) 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658]; *People v. Harris* and *In re Tony C.,* both *supra.*) ■ We believe that the underlying rationale for precluding warrantless arrests in the home except in special circumstances set forth in *Ramey* is such that the *Ramey* holding should also apply to *detentions* in the home that fall short of formal arrests. "An intrusion by the state into the privacy of the home for any purpose is one of the most awesome incursions of police power into the life of the individual. Unrestricted authority in this area is anathema to the system of checks envisaged by the Constitution. It is essential that the dispassionate judgment of a magistrate, an official dissociated from the 'competitive enterprise of ferreting out crime' [citation], be interposed between the state and the citizen at this critical juncture. The frightening experience of certain foreign nations with the unexpected invasion of private homes by uniformed authority to seize individuals therein, often in the dead of night, is too fresh in memory to permit this portentous power to be left to the uninhibited discretion of the police alone." (*Ramey, supra,* 16 Cal.3d 263, 275.)

We hold, therefore, that defendant's warrantless detention in his home and his transportation to the home of the Boyds must be considered invalid unless justified under an exception made permissible by *Ramey.* The exception for exigent circumstances, does not appear to apply. Under the circumstances, the hearing of a noise from the rear of the premises could not reasonably justify the officers in believing that either their personal safety was endangered or that destruction of evidence was imminent.

■ The People urge that there was a consent for the police to enter, given by Cassandra Smith, and that this constitutes an exception to the warrant requirement recognized by *Ramey.* The *Ramey* court stated that a consent-to-enter was an exception to the warrant requirement along with the existence of exigent circumstances.

■ In the case before us, the consent given to the police by Cassandra Smith was a consent for entry to talk about the whereabouts of "Bob Williams" or "Frank Williams." Cassandra's consent cannot be reasonably construed as a consent for the police to go into any room of

the residence in order to find the defendant. If there was any doubt about the scope of the consent, it was dissipated when Cassandra told the officers that her husband, the defendant, was not at home but was at work. The officers did not seek Cassandra's consent to enter the premises to arrest defendant or to *search* for him. The officer's journey to the back of the home and into a bedroom where they found defendant was a journey beyond the scope of the consent-to-enter, extended by Cassandra Smith. (See *People v. Superior Court (Arketa)* (1970) 10 Cal.App.3d 122 [89 Cal.Rptr. 316].) Consequently, defendant's *detention* in his home and his subsequent transportation to the home of the Boyds violated his constitutional right to be free from an unreasonable seizure of his person. The seizure of the shirt and defendant's subsequent arrest and incriminating statements were all the product of his initial illegal detention. Defendant's suppression-of-evidence motion, made prior to the first trial, should have been granted and the shirt and statements suppressed.

Since defendant's first trial did not result in any judgment by reason of a mistrial being declared, he renewed his motion for suppression of evidence prior to the start of the second trial. ·

It is asserted by the People that the trial court was correct in ruling that it had no jurisdiction to consider defendant's renewal of his evidence-suppression motion because defendant had not shown that the provisions of Penal Code section 1538.5, subdivision (h), were applicable. The thesis is urged by the People that defendant exhausted his rights under Penal Code section 1538.5 because the denial order, made before the first trial, had become final by reason of the lapse of the 30-day period (Pen. Code, § 1538.5, subd. (i)), without defendant's seeking a review of the ruling by the appellate writ procedure. *People v. Krivda* (1971) 5 Cal.3d 357 [96 Cal.Rptr. 62, 486 P.2d 1262],[2] points out that Penal Code section 1538.5, subdivision (i), is to be interpreted to preclude any further review of a search and seizure order—not reviewed by the appellate writ procedure within 30 days after the denial of defendant's motion at the special hearing—until an appeal is taken following trial and conviction.

Penal Code section 1538.5, subdivision (h), provides that if, prior to trial, defendant did not have an opportunity to make a suppression-of-evidence motion or if he was not aware of the grounds for the motion, "the defendant shall have the right to make this motion during the course of trial in the municipal, justice, or superior court." Defendant urges the

---

[2]Certain language on an unrelated matter disapproved in *People v. Kaanehe* (1977) 19 Cal.3d 1, 10-11, fn. 6 [136 Cal.Rptr. 409, 559 P.2d 1028].

view that subdivision (h) of section 1538.5 is applicable because *People* v. *Superior Court (Kenner)* (1977) 73 Cal.App.3d 65 [139 Cal.Rptr. 343], created new law which gave defendant grounds for his motion which did not exist at the time of the initial motion before the first trial.

Although *Kenner* constituted an interpretation of the scope of a consent-to-enter, it is doubtful if *Kenner* can be construed as creating new law and providing new grounds for a section 1538.5 motion within the meaning of Penal Code section 1538.5, subdivision (h).

In *Madril* v. *Superior Court* (1975) 15 Cal.3d 73, 77-78 [123 Cal.Rptr. 465, 539 P.2d 33], the court held "that determination of a 1538.5 motion at a special hearing in the superior court—whether in the defendant's or in the People's favor—deprives that court of jurisdiction to reconsider the matter unless the People, pursuant to subdivision (j), seek to reopen the matter *at trial* upon a showing of good cause." In *People* v. *Krivda, supra,* 5 Cal.3d 357, 363, the court recognized that if a defendant did not seek appellate review of a denial of his evidence-suppression motion within 30 days following the denial order, the trial court's ruling would be reviewable on appeal following the trial. "[I]t seems apparent from the language of subdivision (i) of section 1538.5 that the Legislature, in order to reduce the time spent in relitigating search and seizure questions, intended that the court's order denying a motion to suppress should, in the absence of a timely request for extraordinary appellate relief, become final 30 days thereafter and not subject to further review *until an appeal is taken following trial.* Otherwise considerable judicial time could be expended in rehearing and redetermining matters which had already been fully litigated, thereby possibly delaying the trial of the case." (Italics added.)

Neither *Krivda* nor *Madril* dealt with the situation presented in the case at bench of a trial which results in a mistrial rather than a judgment of conviction. It appears reasonable to construe the legislative intent embodied in Penal Code section 1538.5, subdivision (i), as interpreted by *Krivda* and *Madril,* as meaning a special hearing on a motion to suppress which is conducted "prior to [a] trial"—regardless of whether the trial results in a mistrial or in a defendant's conviction. ▮ If there is a mistrial and a second trial, we interpret Penal Code section 1538.5, subdivision (i), as precluding a defendant's motion for suppression of evidence to be heard prior to the second trial when such a motion has been made prior to a first trial which resulted in a mistrial—a motion

which became final as to such first trial by the lapse of 30 days without appellate review by the writ procedure.

Our holding that the superior court lacks jurisdiction to consider a renewal of a motion to suppress evidence which has become final even though the trial following a denial of the motion does not result in a judgment of conviction, does not result in any injustice to defendant. A review of the denial ruling preceding the first trial is permissible upon appeal from a judgment of conviction following a second trial, since the trial court was without jurisdiction to consider any renewal motion.

We thus hold that the trial court did not err in ruling that it had no jurisdiction to consider, on the merits, defendant's motion to suppress evidence, made prior to the second trial—a motion which was in substance a renewal of the motion made prior to the first trial. However, as pointed out previously herein, the trial court erred in not granting defendant's first suppression-of-evidence motion—made prior to the first trial which resulted in a mistrial.

### V

#### Defendant's Incriminating Statements and the Question of Miranda Waiver

We now consider the question of whether defendant's statements to the police were obtained in violation of his *Miranda* rights. Although evidence of his statements was not offered by the prosecution at his trial, defendant asserts that the trial court's ruling was prejudicial nevertheless because defendant did not take the stand to testify in his own behalf as a result of the trial court's ruling. Defendant did announce that he was not taking the stand in order to prevent the prosecution from using evidence of his statements against him if he became a witness. Defendant argues that the erroneous ruling which caused him *not* to take the witness stand is entitled to be considered reversible error in light of *People* v. *Rist* (1976) 16 Cal.3d 211 [127 Cal.Rptr. 457, 545 P.2d 833] and *People* v. *Slone* (1978) 76 Cal.App.3d 611 [143 Cal.Rptr. 61].

The question at issue is whether defendant waived his *Miranda* rights, since the hearing on the suppression motion indicates that the *Miranda* rights were given to defendant. Defendant argues that his case is governed by *People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672], in which the court held that the burden is upon the

prosecution to prove the voluntariness of a confession beyond a reasonable doubt. The People assert that the *Jimenez* rule is not here applicable because, in *People* v. *Duren* (1973) 9 Cal.3d 218, 237 [107 Cal.Rptr. 157, 507 P.2d 1365], the court set forth the applicable rule as follows: "The burden of establishing a waiver of the right to counsel and the right to remain silent is on the prosecution [citations]; and the courts will not lightly find that there has been a waiver of a fundamental constitutional right, but, rather, will indulge in every reasonable presumption against a waiver [citations]. On appeal, however, the burden is on the defendant to establish that he did not competently and intelligently waive the right."

The People have a misconception of the *Duren* holding. *Duren* cannot be interpreted to mean that defendant has a burden of proof in the sense of showing by a preponderance of the evidence or proof beyond a reasonable doubt that he did not make a competent and intelligent waiver of *Miranda* rights. All that the *Duren* court means by burden of proof on appeal is simply that defendant must point out where the record fails to demonstrate that the trial court did *not* apply the principle that "[t]he burden of establishing a waiver of the right to counsel and the right to remain silent is on the prosecution." (*Duren, supra,* 9 Cal.3d 218, 237.)

The issue raised in *Jimenez* was not a question of a knowing and intelligent waiver of *Miranda,* but a question of whether a confession is involuntary in the sense that it was elicited by some promise of benefit or leniency. We need not determine whether the *Jimenez* beyond-a-reasonable-doubt burden of proof should be applied to the question of whether *Miranda* rights were given to the defendant and whether he intelligently and knowingly waived those rights. The question involved here is whether the uncontradicted evidence establishes that the trial judge could not reasonably have found that the prosecution had sustained its burden of proving that the defendant had made a knowing, intelligent and voluntary waiver of his right to remain silent and of his right to counsel, irrespective of the burden of proof standard to be applied. (See *People* v. *Marshall* (1974) 41 Cal.App.3d 129 [115 Cal.Rptr. 821].)

In *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], it was stated unequivocally that "[o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he

has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." (*Id.,* at pp. 473-474 [16 L.Ed.2d at p. 723]; fn. omitted.) It was pointed out in *People* v. *Enriquez* (1977) 19 Cal.3d 221, 237 [137 Cal.Rptr. 171, 561 P.2d 261], that "*Miranda* holds, unequivocally, that '[i]f [a suspect who has been advised of the prescribed constitutional rights] states that he wants an attorney, the interrogation must cease until an attorney is present.' [Citations.] . . ." "[E]ven an indirect indication that a suspect wants an attorney present compels an immediate cessation of the interrogation until an attorney is present." (*Enriquez, supra,* 19 Cal.3d 221, 237.)

In the case at bench, the record indicates that when asked whether he understood the rights explained to him and whether he desired to talk without having an attorney, the defendant gave ambiguous answers such as that he did not know how to answer those questions being asked. Thus, when asked did he want to talk about the accusation against him, he answered: "Man, really I'm confused. I don't know what to do, to say or what." The interrogating police officer responded by telling defendant: "Well, are you, you sure try to pretend to be confused. I don't think you're confused as you pretend to be because you lied . . . to us three times." In spite of answers such as these, the interrogating officer kept pressing the defendant as to whether he wanted to talk about the accusations against him. In answer to one question as to whether he wanted to talk about the accusations without an attorney, defendant replied: "Wait a minute." The police officer then asked: "Are these people lying on you or were you there when they had this White girl in a house?" This type of interrogation question came before there had been any clear indication from defendant that he was willing to be interrogated about the charges and without having an attorney present.

The record demonstrates in a convincing fashion that defendant's incriminating statements to the police were the product of continued police pressure upon defendant to secure a waiver of the right to remain silent and the right to an attorney. ▮ The *Enriquez* court made it clear that "just as *Miranda* prohibits continued police interrogation into the substantive crime after a clear indication that a suspect wants an attorney present, it also prohibits continued police efforts to extract from a suspect a waiver of his rights to have an attorney present after a clear indication that the suspect desires such an attorney." (*Enriquez, supra,* 19 Cal.3d 221, 238.) It follows also that *Miranda* prohibits continued police efforts to extract from a suspect a waiver of his rights to remain silent

after a clear indication that he does not really want to talk about the accusations against him.

Since we conclude that the trial court erred in ruling that evidence of defendant's incriminating statements to the police was not secured in violation of *Miranda,* we need not concern ourselves with defendant's contention that, because he chose not to testify as a direct result of the erroneous ruling, he suffered prejudice from this ruling.

VI

*The Discoverability of the Prosecutor's*
*Notes of an Interview With Rebecca*
*Prior to the First Trial*

■ Defendant claims that the trial court erred in denying his discovery motion to reach a prosecutor's notes of an interview with Rebecca, the rape victim. The interview occurred prior to the first trial and defendant's discovery motion was made prior to the first trial. There was no renewal of the defendant's motion after the first trial resulted in a mistrial.

But this is an appeal from the judgment rendered in the second trial. Such appeal reaches errors occurring during the second trial but does not normally reach errors occurring during a first trial unless such errors were repeated and infected the second trial. Since defendant was before a different trial judge and made no effort to secure the notes by way of a new discovery motion, we can only assume that he decided that the notes were not required for defense preparation at the second trial.

However, since the issue may arise in the event of a retrial, we deal with the issue for guidance of the trial judge.

■ We hold that the trial judge erred in denying defendant's motion for discovery. The erroneous ruling was made on the ground that the prosecutor's notes regarding his interview with Rebecca, the victim, were immune from discovery because of the privilege for an attorney's work product. We have reviewed the notes. They are simply the prosecutor's summary of statements of Rebecca, the victim.

It is well-settled that there is no attorney's work-product privilege for statements of witnesses since such statements constitute material of a

nonderivative or noninterpretative nature. (*Craig* v. *Superior Court* (1976) 54 Cal.App.3d 416 [126 Cal.Rptr. 565]; see Jefferson, Cal. Evidence Benchbook (1972) Attorney's Work-Product Privilege, §§ 41.1-41.2, pp. 701-712, (1978 supp., pp. 475-483).)

 In the case before us, the trial judge also ruled that the prosecutor's notes were nondiscoverable on the ground that there was nothing in the notes which could be used by defendant to impeach Rebecca as a witness. This represents an erroneous approach to discovery. Material sought on discovery need not be admissible evidence. It is an "established principle that in a criminal prosecution an accused is generally entitled to discover all relevant and material information in the possession of the prosecution that will assist him in the preparation and presentation of his defense." (*Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 293 [124 Cal.Rptr. 204, 540 P.2d 44].) Thus, in the event of a retrial, if defendant renews his motion for discovery of the prosecutor's notes regarding the Rebecca interview, such motion should be granted.

## VII

*The Denial of a Fair Trial by Exhibiting*
*Before the Jury Defendant's Former*
*Codefendants Dressed in Jail Garb*

In three separate instances at defendant's second trial, the prosecutor was permitted to have defendant's original codefendants, Boyd, Hardaway and Waters, displayed before the jury while dressed in jail garb. Before the trial court's ruling permitting this procedure, defendant objected on grounds that the procedure brought irrelevant evidence before the jury and constituted great prejudice to the defendant. In support of the ruling the prosecutor claimed that the procedure produced relevant evidence in that it permitted the victim's identification of the codefendants as coperpetrators of the sex crimes committed against the victim to go before the jury, and that such identification tended to corroborate the victim's credibility in identifying defendant as one of the perpetrators of the sex crimes committed against the victim.

One instance in which the original codefendants, Boyd, Hardaway and Waters were displayed before the jury while wearing their jail garb was during the testimony of Officer Alex Tingirides. While these three original codefendants were standing in the courtroom in the jury's presence in jail attire, Officer Tingirides was permitted to testify to the

following: that he arrested Boyd first, then Waters, and then Hardaway; that when Rebecca, the victim, came to the police station she passed a bench at which Boyd and Hardaway were seated and exclaimed: "That's them, that's them"; that after making the statement, he, the officer, observed that Rebecca began to tremble, cry and stagger and that he then assisted her over to a chair.

A second instance in which Boyd, Hardaway and Waters were exhibited before the jury in their jail garb was during the reading of the victim's first-trial testimony in which she identified Boyd, Hardaway and Waters as coperpetrators of the sexual offenses. This included a point during her testimony in which she identified Hardaway as one of the perpetrators of the offenses against her and the prosecutor spoke up and requested that the record reflect that Hardaway was *then in the courtroom* and that "he is the *defendant* farthest to the right facing the jury."

The third instance in which the three former codefendants of the defendant were paraded before the jury in their jail attire was during the closing argument of the prosecutor.

Defendant advances the contention that the trial court's ruling, which permitted the former codefendants to be brought before the jury in their jail attire on three separate occasions, constituted an invasion of defendant's constitutional right to a fair trial because this procedure presented irrelevant evidence to the jury and was extremely prejudicial. We find lacking in substance the People's response that the procedure brought relevant evidence before the jury and was nonprejudicial to defendant.

The fact that the victim identified Boyd, Hardaway and Waters as three of the four perpetrators of the offenses committed against her has no tendency in reason (see Evid. Code, § 210 that defines "relevant evidence") to establish that her identification of defendant as one of the four perpetrators was an accurate identification. The victim could have been mistaken in her identification of Boyd, Hardaway and Waters. But even assuming that she was accurate in her identification of Boyd, Hardaway and Waters, such accuracy of identification of these three does not lead either reasonably or logically to the inference that her identification of defendant was also accurate.

But even if we assume that this parading before the jury of defendant's former codefendants dressed in jail garb had some slight relevancy to

support the credibility of Rebecca's testimony in identifying defendant as a coperpetrator, we must still consider the question of whether the probative value of such evidence is substantially outweighed by the danger of undue prejudice to defendant under Evidence Code section 352 and whether such procedure constitutes an invasion of defendant's constitutional right to a fair trial.

Evidence that Rebecca identified Boyd, Hardaway and Waters as coperpetrators of the offenses against her can have substance on the issue of the correctness of her identification of defendant as one of the coperpetrators only if she was correct in identifying Boyd, Hardaway and Waters as coperpetrators. The assumption before the jury in permitting the identification by the victim of Boyd, Hardaway and Waters as coperpetrators is necessarily that she was correct in naming these three. Their appearance in jail clothing would persuasively lead the jury to believe that her identification of them was correct because they had already been convicted of the offenses since they were dressed in jail clothing and the defendant was not.

The relevancy of parading these three former codefendants before the jury during the testimony of Officer Tingirides is even less tenuous than their appearance before the jury during the reading of Rebecca's first-trial testimony. Of what possible relevance was the testimony of the police officer regarding the order in which he made arrests of these persons? Certainly the jury was apt to conclude that each had been convicted since evidence was permitted that each had been arrested. It may also be asked: What purpose was served in permitting the officer to testify about Rebecca's statement in the jail when she first observed Boyd and Hardaway and then trembled, became nervous and had to be assisted to a chair? That such evidence would tend to inflame the jury against defendant rather than leading to a verdict on the merits is too clear to need further elucidation.

■■■ We turn next to a consideration of whether the trial court's ruling permitting defendant's former codefendants to be exhibited before the jury while wearing their jail clothing constituted an invasion of defendant's right to a fair trial. ■■■ "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. [Citation.] The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (*Estelle* v. *Williams* (1976) 425 U.S. 501, 503 [48 L.Ed.2d 126, 130, 96 S.Ct. 1691].) The *Estelle* court then added this significant

principle: "To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. [Citation.]" (*Id.* at p. 503 [48 L.Ed.2d at p. 130].)

In *Estelle*, the court points out the constitutional evil of compelling a defendant to appear before the jury in jail attire. "Courts have, with few exceptions, determined that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence] so basic to the adversary system." (*Estelle, supra,* 425 U.S. 501, 504 [48 L.Ed.2d 126, 130]; fn. omitted.)

 In the case at bench we have the situation—not of a defendant being exhibited before the jury in jail clothing—but of a defendant's former codefendants being so exhibited. The question is whether such procedure or practice is equally offensive to the right of a defendant to a fair trial. The answer depends on the possible effect of the procedure upon the jury's determination of the issues before it.

The principle which must guide us in determining whether a particular practice is to be condemned because of its possible effect on the jury is set forth in *Estelle*: "The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for *close judicial scrutiny.* [Citations.] Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." (*Estelle, supra,* 425 U.S. 501, 504 [48 L.Ed.2d 126, 130].) (Italics added.)

In the case before us, the circumstances under which the codefendants were paraded before the jury while wearing jail garb had to lead inexorably to the conclusion that the jury would probably find the defendant guilty because of this procedure and the testimony of Officer Tingirides and the first-trial testimony of Rebecca, the victim, which was a part of this procedure.

The errors which we have discussed herein are clearly prejudicial and mandate a reversal of the defendant's conviction. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Duran* (1976) 16 Cal.3d 282, 296 [127

Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; and *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is reversed.

Files, P. J., and Kingsley, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 12, 1979.