18 Cal.Rptr.3d 790 (2004)
122 Cal.App.4th 488
The PEOPLE, Plaintiff and Respondent,
v.
Ray Theodore JILES, Defendant and Appellant.
No. E034087.
Court of Appeal, Fourth District, Division Two.
September 16, 2004.
Review Granted December 22, 2004.
*792 Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, San Diego, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, David Delgado-Rucci, Bradley A. Weinreb, and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

*791 OPINION
GAUT, J.
Defendant Ray Theodore Jiles appeals from judgment entered following a jury conviction for second degree murder. (Pen.Code, § 187, subd. (a).)[1]
After the trial court on numerous occasions suspended criminal proceedings upon finding defendant incompetent to stand trial, a jury found defendant guilty of murdering his wife, Marion Jiles. Following the sanity phase, the jury also found defendant was legally sane at the time of the murder. The trial court sentenced defendant to an indeterminate prison term of 15 years to life.
Defendant contends the trial court erred in admitting hearsay statements by Marion shortly before she died implicating defendant, and erred in admitting defendant's taped statement to the police in the absence of an attorney, even though he had previously requested an attorney. Defendant also contends there was insufficient evidence he was sane at the time of the murder, and the trial court erred in limiting defendant's expert testimony.
We reject defendant's contentions and affirm the judgment.

*793 1. Factual and Procedural Background

During the early morning hours of June 16, 1989, defendant stabbed to death his wife, Marion Jiles. At the time of her murder, a neighbor, Ted Barry, was awakened by screeching tires or screaming. He ran outside and saw a man jump inside a red van. Barry approached the man in the van and asked him what happened. The man said, "I caught her fooling around with some guy." Barry provided the van license plate number to the police but was unable to identify the man as defendant.
Another neighbor, Denise Chaldu, also was awakened by a woman screaming and went outside. She saw a man running up toward a van but was unable to identify the man.
At 4:00 a.m., in response to citizen calls, Chino Police Officer McLelland was dispatched to the scene. Upon arriving, he saw Marion sitting on the front step of a residence, profusely bleeding from a right shoulder blade wound. McLelland asked her what had happened and Marion told him defendant had stabbed her, most likely with a screwdriver. She then lost consciousness. Paramedics transported her to the hospital and she died about an hour later from a stab wound to her back that punctured her lung.
Geraldine Mems Irons, a friend whom defendant regularly drove to work, testified defendant left her home around 7:00 p.m. on June 15, 1989, and returned to take her to work the next morning. In the morning he drove her to work in a Chevrolet El Camino. As they drove by Marion's home, defendant stopped when he saw a police car stopped by his red van. He told police officers, Musselwhite and McCord, "that is my van." The officers then took him into custody.
Investigating officers collected various items, including clothing, blood, a screwdriver inside the red van, gloves, and a steak knife handle, linking defendant to the homicide.
After being advised of his Miranda[2] rights on June 16, 1989, defendant told police detective Hannibal he had spent the entire evening of June 15th at Irons's home and left at 8:00 a.m. the next morning. Defendant said he had not seen Marion for two months. A couple hours later, Lieutenant Beckman[3] interviewed defendant. During the taped interview, defendant implicated himself in the death of Marion. In particular, he said he had stabbed Marion with a knife.
At trial defendant testified that the voice on the taped statement was not his voice. He also stated he had gone to Marion's home and she had tried to kill him. They ended up in his van. She hit him in the face and called him names. She then jumped out of the van and ran away. He did not hit or stab her, although he threatened her with a knife. He denied killing Marion. On cross-examination, he acknowledge he may have stabbed Marion during a struggle in the van. He also recalled telling Barry Marion had been cheating on him.
In September 1989, defendant was charged with murder. The criminal proceedings were suspended and reinstated on numerous occasions based on findings defendant was incompetent to stand trial but then later found to be competent. After 10 years of delays in prosecuting defendant, on February 7, 2003, defendant was found competent to stand trial, criminal proceedings were reinstated, and trial commenced on April 14, 2003.
*794 On May 2, 2003, the jury found defendant guilty of second degree murder. On May 7, 2003, the jury found defendant legally sane during the commission of the murder.

2. Admissibility of Marion's Statements Under Crawford v. Washington[4]
Defendant argues the trial court erred in admitting Marion's statement to Officer McLelland implicating defendant. The trial court admitted the hearsay statement pursuant to Evidence Code section 1240 under the spontaneous utterance hearsay exclusion. We find no error.

A. Facts
Shortly after the stabbing incident, Officer McLelland reported to the crime scene. Upon arriving, he saw Marion sitting on the front step of a residence. She was bleeding profusely, hysterical, and having great difficulty breathing. Marion had a black eye and blood running from the left temple area. Her shirt was soaked with blood. Most of the blood appeared to be flowing from the area of her right shoulder blade. Later, McLelland observed Marion also had a two-inch puncture-type wound to her left arm, a puncture wound to her hand, and a four- to five-inch slash across her chest.
McLelland asked Marion what happened. Marion replied that she had been beaten up. McLelland asked her, "Who beat you up?" Marion said her husband, Ray (defendant), did. McLelland further testified as follows:
"I said, `Why are you bleeding so much from the back portion of your back?'
"She said, `He stabbed me. I think it was a screwdriver.'
"I said, `Who stabbed you?'
"She said, `My husband, Ray Jiles.'
"At that point, she said, `I can't breathe. I can't breathe.'
"Then, I asked her where her husband lived, and she said 4144 Compton. It was about that time she went unconscious."
After speaking to Officer McLelland for a couple minutes, Marion passed out from her injuries. The paramedics arrived and Marion died at the hospital about an hour later. McLelland described Marion's demeanor during the three-to-four minute conversation as being hysterical and terrified.
On March 11, 1994, defendant filed a motion in limine to exclude Marion's statement. Defendant argued it was not a dying declaration because there was no evidence Marion knew that her death was imminent. The prosecution filed opposition on March 21, 1994, arguing Marion's statements were admissible under the spontaneous utterance hearsay exception.
On March 15, 1994, the court heard defendant's motion in limine and found that Marion's statements were admissible under the spontaneous declaration hearsay exception, reasoning that Marion made the statements spontaneously, under the stress of excitement of having just been stabbed, and this indicated the statement was truthful. The criminal proceedings, however, were suspended due to the court finding defendant was incompetent to stand trial.
Eventually, the court found defendant was competent and recommenced trial proceedings in 2003. The parties again raised the issue of admissibility of Marion's statement during a motion in limine hearing on April 15, 2003. The prosecution again moved for admission of Marion's statement, and defendant moved to exclude it. *795 The court initially stated it intended to admit the statement under Evidence Code sections 1240 and 1242.
During an Evidence Code section 402 hearing on the matter, the prosecution called McLelland, who testified to the circumstances concerning Marion's statement. The prosecution argued the statement was admissible under both Evidence Code sections 1240 and 1242, but acknowledged admissibility under the dying declaration exception was not as strong as under Evidence Code section 1240. The court held the statements were admissible under Evidence Code section 1240, noting that the court "has its doubts" as to Evidence Code section 1242.

B. Discussion
Defendant argues that under Crawford v. Washington, supra, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, Marion's statement to Officer McLelland that defendant stabbed her was inadmissible. In Crawford the U.S. Supreme Court held that a witness's testimonial out-of-court statement is barred under the Sixth Amendment Confrontational Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. (Id. at p. 1374.)
The Crawford court left unanswered the question of whether a dying declaration is admissible and whether such a statement to an officer is testimonial. Irrespective of whether the statement is testimonial, however, the Crawford court indicated that under the rule of forfeiture by wrongdoing the statement is not barred, even in the absence of the opportunity to cross-examine the witness. The Crawford court noted in a footnote, "The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. [Citation.] ... Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. [Citations.] We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is sui generis." (Crawford v. Washington, supra, 541 U.S. at p. 54, fn. 6, 124 S.Ct. at p. 1367, fn. 6.)
The Crawford court further noted that dying declaration testimony has in the past been deemed admissible, despite the absence of an opportunity to cross-examine, based on equitable principles. The court explained that, as regards dying declarations, "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability. [Citation.]" (Crawford v. Washington, supra, 541 U.S. at p. 62, 124 S.Ct. at p. 1370.)
While the Crawford court did not decide the issue of whether a dying declaration is admissible despite the defendant being deprived of the opportunity to cross-examine the witness, the Crawford court indicated such evidence might be admissible under equitable principles, and we adhere to this reasoning in concluding Marion's statement is admissible, even assuming without deciding the statement was testimonial.
Defendant argues that, since the trial court admitted Marion's statement as a spontaneous utterance, not a dying declaration, under Crawford the statements are barred. We disagree. Regardless of whether under Crawford a spontaneous declaration may be inadmissible in the absence of an opportunity to cross-examine, under the circumstances in the instant case, Marion's statement was admissible. First, the prosecution sought admission of the statement under both the spontaneous *796 utterance and dying declaration exceptions and the court did not definitively reject admissibility based on the dying declaration. Initially, it indicated the statements were admissible under both exceptions but, without rejecting the dying declaration exception, ultimately chose to base its ruling on the spontaneous utterance exception, concluding the dying declaration exception was not as strong a ground.
Second, there was sufficient evidence to support admission under the dying declaration exception since the evidence established that Marion's injuries were sufficiently severe to support a finding that she was well aware of the probability death from her injuries was imminent. Her statement was made shortly after she was stabbed, within moments before she lost consciousness from her injuries, and within an hour before she died. When Marion made the statement, she was at the crime scene, hysterical, struggling to breath, covered in blood and bleeding profusely, and knew she had just been stabbed.
Third, although the trial court could have admitted Marion's statement as a dying declaration, the fact the court admitted it only as a spontaneous statement is inconsequential. Regardless of whether her statement qualified as a dying declaration, "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds." (Crawford v. Washington, supra, 541 U.S. at p. 62, 124 S.Ct. at p. 1370.)

3. Defendant's Taped Interview

Defendant contends the trial court erred in admitting defendant's taped statement made to Lieutenant Beckman after defendant had requested an attorney.
After defendant was arrested and brought to the police station, he was taken to an interview room. Detective Hannibal advised him of his Miranda rights at 10:00 a.m. Defendant waived his rights and agreed to speak to Hannibal. After 20 minutes of questioning, defendant requested an attorney. Hannibal terminated the interview and told Beckman defendant wanted an attorney. Beckman made arrangements for a patrol officer to transport defendant to the jail facility. Since a patrol officer was not immediately available and there was no holding cell at the police station, defendant waited quietly with Detective Flannagan in Flanagan's office cubicle while Flannagan worked on various cases.
After about 15 minutes, defendant initiated conversation with Flannagan by commenting, "Jeannie isn't dead, she's too tough." Defendant asked if Flannagan had seen her. Flannagan responded he had not seen her and did not have direct knowledge of the matter but was told she was deceased. Defendant said again she was too tough. Flannagan told him he did not know anything about it; he was just watching defendant and, if defendant wanted details, he should talk to Beckman who was approaching Flannagan. Flannagan never asked defendant any questions.
When Beckman approached Flannagan to discuss some other cases, Flannagan told him defendant was inquiring regarding his wife's status. Before discussing the matter, Beckman confirmed defendant was aware of his rights and wished to talk even though he had previously requested an attorney.
Beckman: "You do recall that Detective Hannibal advised you of your rights?"
Defendant: "Yes, I do."
Beckman: "And you do recall that you asked to speak to a lawyer and now you're telling me you want to talk to me without a lawyer."
Defendant: "Yes."
*797 Hannibal had advised defendant of his Miranda rights about two hours before and defendant told Beckman he was aware of his rights but nevertheless wished to speak to Beckman. Defendant also consented to the conversation being recorded. Defendant then spoke to Beckman. During the taped conversation, defendant admitted stabbing Marion.
Defendant filed a motion in limine to exclude the statement on the grounds it was obtained in violation of his right against compulsory self-incrimination. Defendant argues he invoked his right to an attorney and did not initiate further communication with Beckman. Rather, defendant claims Flannagan told Beckman defendant wanted to speak to him and this constituted an unlawful police-initiated communication after defendant had invoked his right to counsel.
Before admitting the evidence, the trial court conducted a hearing pursuant to Evidence Code section 402. At the hearing, Hannibal, Flannagan, Beckman, and defendant testified concerning the circumstances of the recorded statement. After the parties argued the matter, the court denied the motion to exclude defendant's recorded statement on the grounds defendant initiated the conversation after initially requesting an attorney, was reminded of his rights, and said he wished to waive them.
Miranda v. Arizona (1966) 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 requires that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.... Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (Id. at p. 444, 86 S.Ct. 1602.) All of these rights are referred to generally as his Miranda rights.
"`Interrogation' consists of express questioning, or words or actions on the part of the police that `are reasonably likely to elicit an incriminating response from the suspect.' [Citations.] `The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' [Citations.]" (People v. Cunningham (2001) 25 Cal.4th 926, 993, 108 Cal.Rptr.2d 291, 25 P.3d 519.) Once a defendant invokes his right to counsel, "`"the interrogation must cease until an attorney is present."' [Citations.]" (People v. Bradford (1997) 14 Cal.4th 1005, 1033-1034, 60 Cal.Rptr.2d 225, 929 P.2d 544), and any subsequent contact by law enforcement is proper only if that contact is initiated by the defendant. (Edwards v. Arizona (1981) 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378.)
The statements defendant made after he invoked his Miranda rights and requested counsel were made of defendant's own volition, without any prodding from Flannagan or Beckman. Flannagan made no inquiries that would have reasonably led to an incriminating response from defendant. Rather, Flannagan merely briefly responded to defendant's comments and told defendant, if he wanted information concerning the matter, he should speak to Beckman. Defendant then insisted on speaking to Beckman, even after Beckman reminded him of his Miranda rights and that he had previously requested an attorney. Under such circumstances, we conclude *798 the trial court did not err in admitting defendant's taped statements.
Defendant argues that the officers improperly initiated communication and were required to readvise him of his rights before Beckman interrogated him. Defendant claims he only inquired regarding Marion's condition and did not indicate a desire for a complete reopening of discussions with the officers. The record, however, reveals that Hannibal, Flannagan, and Beckman did not make any remarks to induce defendant to initiate the contact that resulted in defendant's recorded statement with Beckman. Defendant initiated conversations with Flannagan and Beckman, and expressed a desire to speak to Beckman in the absence of counsel.
Defendant's statement was not the product of continued police pressure to waive the right to an attorney and speak to the police detectives. (People v. Enriquez (1977) 19 Cal.3d 221, 238, 137 Cal.Rptr. 171, 561 P.2d 261, disapproved on other grounds in People v. Cromer (2001) 24 Cal.4th 889, 901, 103 Cal.Rptr.2d 23, 15 P.3d 243.) The record supports the trial court's finding defendant's recorded statement was voluntary and thus admissible.
Defendant argues the officers should have readvised him of his Miranda rights. "Ideally, the Miranda warnings should be repeated before reinitiating the interrogation of a suspect who has invoked the right to remain silent but the failure to do so is not fatal if the `totality of the circumstances' shows the suspect's waiver remains voluntary, knowing and intelligent." (People v. Riva (2003) 112 Cal. App.4th 981, 993, 5 Cal.Rptr.3d 649, fn. omitted, petn. for review filed Dec. 1, 2003.)
We find no error in Beckman not readvising defendant of his Miranda rights since Hannibal initially advised defendant of his rights within a couple hours before defendant spoke to Beckman; defendant initiated communication with Flannagan and Beckman, and insisted upon speaking to Beckman; Beckman asked defendant whether he was aware of his rights and noted defendant had previously requested an attorney; defendant indicated to Beckman that he was aware of his rights and, even though he did not have an attorney, he wished to speak to Beckman; and defendant consented to his statement being taped. These circumstances show defendant's rights were not violated when he voluntarily and knowingly gave the taped statement.

4. Insanity Defense

Defendant contends there is insufficient evidence supporting the trial court's finding that he was sane at the time of the murder. He argues that both psychologist Kent Franks and psychiatrist Edward Case testified defendant was not sane. In addition, the trial was delayed over 10 years due to the trial court repeatedly finding defendant was incompetent to stand trial within the meaning of section 1368.

A. Burden of Proof
Section 1026, subdivision (a), provides that if a defendant is found not guilty by reason of insanity at the time the offense was committed, the court shall direct that the defendant be confined to a state hospital, unless it appears that the defendant's sanity has been restored. "On the trial of the issue raised by the plea of not guilty by reason of insanity there is a rebuttable presumption that the accused was sane at the time the crime was committed. [Citations.] The accused has the burden of proving his insanity by a preponderance of the evidence. [Citations.] The evidence of insanity presented by the *799 accused must outweigh the prosecution's evidence (including the presumption of sanity) not in number of witnesses or quantity of evidence, but in its effect on the jury. [Citations.] The finding of the trier of fact upon the issue of insanity cannot be disturbed on appeal if there is any substantial and credible evidence in the record to support such finding. [Citation.]" (People v. Dean (1958) 158 Cal. App.2d 572, 577, 322 P.2d 929; see also § 25, subd. (b).)

B. Evidence of Defendant's Mental State
Kent Franks, a private practice clinical psychologist, who worked at Patton State Hospital (Patton) between 1987 and 1990, reviewed defendant's history and interviewed defendant in 2000. Franks testified that defendant was insane at the time of the murder. He was incapable of distinguishing between right and wrong at the time of the homicide, did not understand the nature of his conviction, was subject to impulsive behavior, and was borderline mentally retarded and delusional due to suffering severe head trauma during a motorcycle accident in 1986. In addition, prior to the accident, defendant suffered a head injury from being hit in the head with a pipe, which also caused brain damage. After the motorcycle accident, defendant believed his wife worked as a prostitute and was stealing his social security disability funds. He also denied he killed her and believed, at the time Franks interviewed him, that she was still alive.
Dr. Case, was hired as a psychiatrist at Patton after completing his residence in 2001. At the time of trial in May 2003, Case was defendant's doctor at Patton. Case questioned whether defendant was capable of adequately participating in his own defense due to a cognitive disorder. Case testified that, because of a head injury, defendant has significant memory difficulties and, when he does not remember something, he confabulates. Case concluded defendant was criminally insane and not competent to stand trial.
"Where ... the evidence is uncontradicted and entirely to the effect that the accused is insane, the presumption of sanity may not be permitted to prevail." (In re Dennis (1959) 51 Cal.2d 666, 674, 335 P.2d 657.) But the record here, discloses evidence that contradicted defendant's claim of insanity.
Contrary to Franks and Case's findings, court-appointed psychologists Stephen Lawrence and Jerry Goffman testified that defendant was competent to stand trial and was sane at the time of the offense. Lawrence and Goffman both interviewed defendant for over an hour and reviewed his records.
Lawrence has extensive experience conducting sanity evaluations. He received his doctorate in psychology in 1962, is board certified in clinical psychology, forensic psychology, marriage and family therapy, and psychotherapy. He worked at Patton for five years, was chief psychologist and director of psychology training for San Bernardino County Department of Mental Health for seven years, and thereafter was in private practice. Over the past 25 years, he has conducted close to a thousand court-ordered sanity and competency evaluations.
Lawrence interviewed defendant in November 1989. Based on the interview, testing, and a review of defendant's documents, Lawrence found that, while defendant had suffered a brain injury from a motorcycle accident, he was not mentally retarded. He has low intelligence and does not have an easily diagnosable mental disorder. Lawrence concluded defendant was capable of knowing the nature and *800 quality of his acts and distinguishing between right and wrong. Thus, he was sane at the time of the homicide.
Goffman received his doctorate in psychology in 1972 and has been a licensed psychologist since 1980. He was chief psychologist at San Bernardino County inpatient unit for five years, and also provided jail inmate psychological screening. He has done about 200 sanity and 800 competency evaluations for the courts.
After examining and testing defendant in 1989 and reviewing his records, Goffman concluded defendant was sane at the time of the offense and had also planned and premeditated the offense. Goffman concluded defendant's brain injury from the motorcycle accident did not interfere with his ability to know right from wrong and did not distort defendant's perceptions or behavior. Defendant did not appear to have any delusions or hallucinations and was capable of controlling his behavior.
Defendant argues that, despite Lawrence and Goffman's testimony, he met his burden of establishing insanity through Franks and Case's testimony that defendant had organic brain damage, was delusional, and his delusions precipitated the killing. This established that he was incapable of distinguishing moral right from moral wrong and thus was insane.
Even though there is evidence supporting an insanity finding, applying the substantial evidence standard of review, we conclude the jury's sanity finding is supported both by the sanity presumption and other substantial evidence. (People v. Dean, supra, 158 Cal.App.2d at page 577, 322 P.2d 929.[5]) Lawrence and Goffman's testimony provide sufficient evidence to support the jury's finding that defendant understood the nature and quality of his acts and right from wrong and, thus, was sane when he murdered Marion.

5. Defense Expert Testimony

Defendant contends the trial court unduly limited his expert's testimony during the sanity phase. During the trial, defendant sought to introduce the opinions of nontestifying experts through testifying experts who relied upon such opinions in concluding defendant was legally insane at the time of the murder. Specifically, defendant complains the court erred in precluding Franks from testifying as to the opinions of other doctors who examined defendant closer to the time of the murder. The trial court ruled that defendant's experts could not relate the expert opinion of another expert, even if relied upon by the testifying expert.
Citing People v. Catlin (2001) 26 Cal.4th 81, 109 Cal.Rptr.2d 31, 26 P.3d 357, the trial court refused to allow Franks to testify as to other doctors' opinions. In Catlin the court held the trial court may exclude expert testimony containing hearsay matter in which its irrelevance, unreliability or potential for prejudice outweighs its probative value. The Catlin court stated: "We have explained that `[a]n expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably ... be relied upon" for that purpose. [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, "`under the guise of reasons,'" the expert's detailed explanation "`[brings] before the jury incompetent hearsay evidence.'"' [Citations.] In this context, the court may `"exclude from an expert's testimony any hearsay matter *801 whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value."' [Citation.]" (Id. at p. 137, 109 Cal.Rptr.2d 31, 26 P.3d 357.)
Defendant argues the trial court should have permitted Franks to testify to the doctors' opinions he relied upon in forming his own opinion. Even if the trial court may have had discretion to do so, excluding such hearsay testimony was not an abuse of discretion. As defendant acknowledges in his appellant's opening brief and, as he agreed in the trial court, it is well-established that it is generally impermissible for a testifying expert to recount the details of another physician's report or opinions.
"Psychiatrists, like other expert witnesses, are entitled to rely upon reliable hearsay, including the statements of the patient and other treating professionals, in forming their opinion concerning a patient's mental state. [Citations.] On direct examination, the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion. [Citation.] [¶] An expert witness may not, on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts. `"`The reason for this is obvious. The opportunity of cross-examining the other doctors as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse.'"' [Citations.]" (People v. Campos (1995) 32 Cal.App.4th 304, 307-308, 38 Cal.Rptr.2d 113.)
We find no abuse of discretion in the trial court's exclusion of hearsay expert testimony relating nontestifying experts' opinions, even if those opinions were relied upon by Franks in forming his own opinions. The court properly excluded such testimony.

6. Disposition

The judgment is affirmed.
We concur: McKINSTER, Acting P.J., and WARD, J.
NOTES
[1] Unless otherwise noted, all statutory references are to the Penal Code.
[2] Miranda v. Arizona (1966) 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694.
[3] Lieutenant Beckman was a sergeant at the time of the interview.
[4] Crawford v. Washington (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.
[5] Overruled on other grounds by Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, footnote 13, 108 Cal.Rptr.2d 409, 25 P.3d 618.